WILLIAM CAMERON et al., complainants-respondents,

*v.*

INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYES AND MOVING PICTURE OPERATORS OF THE UNITED STATES AND CANADA, LOCAL UNION NO. 384 OF HUDSON COUNTY, NEW JERSEY, et al., defendants-appellants.

[Argued October 23d, 1935. Decided January 31st, 1936.]

Mr. *Saul Nemser* and Mr. *John Milton,* for the appellants.

Mr. *Norbury C. Murray* and Mr. *Wallace P. Berkowitz,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

Our reversal of the final decree originally entered was predicated upon the holding that the classification of the union membership as "seniors" and "juniors," and the underlying provisions designed to give the former preference in employment, constituted an arbitrary and capricious discrimination between the members of the union in respect of equality of opportunity to work, and a deprivation of the "junior" members' fundamental rights of liberty and property, in contravention of public policy. *118 N. J. Eq. 11.* Upon the filing of the *remittitur* in the court below the cause again proceeded to final hearing before another vice-chancellor without a reference. While expressing the view that the contract is not severable, but void *in toto* and that the "only lawful class of membership of the union is the class that has been called the senior members," the learned vice-chancellor nevertheless felt constrained, in the effectuation of our mandate, to regard the contract as divisible. The decree annulled and voided "any division or classification of members of said local, into 'seniors' and 'juniors' (or 'apprentices') or otherwise, or * * * any differentiation between any such members of said local;" and it was adjudged that complainant and "other members of said local," theretofore classed as "juniors," are "members of said local on a parity with those members" designated as "seniors." Appropriate injunctive relief was granted.

Defendants complain of this decree, and urge, *in limine,* that the bill should have been dismissed for the non-joinder of the International Alliance, the parent body, and that, in any event, the vice-chancellor who advised the decree was not vested, by an appropriate order of reference, with jurisdiction to hear and determine the issue. We find these contentions to be insubstantial.

The point of non-joinder was not seasonably made; it was raised for the first time at the rehearing held to effectuate the mandate of this court. It was incumbent upon the chancellor to execute the judgment embodied in this precept. It has

been held that the point of want of jurisdiction of the cause comes too late after the mandate has gone down from the appellate court, where such lack does not appear on the face of the bill of complaint. *Whyte* v. *Gibbes, 20 How. 541; 15 L. Ed. 1016.* Non-joinder of a necessary party is not a jurisdictional defect, except as to such party. *21 C. J. 277, 331, 334.*

Nor do we regard the international body, in the situation here presented, as a necessary or indispensable party. The relief prayed may properly be had by a decree operating upon the local union and its officers. As will be hereafter pointed out, the obnoxious classification of the local affiliate's membership, designed to give unreasonable preference in employment to one class, finds no sanction in the constitution or by-laws of the parent body; and, such being the case, we are unable to perceive how that body has any interest in the matter of the striking down of this arbitrary classification that gives it the status of an indispensable party. At all events, such interest as it may have is a separable one; and the court below was, under the circumstances, justified, in the exercise of a sound discretion, in proceeding to a decree for the relief prayed against the local body and its officers.

And, in the circumstances, the lack of an appropriate reference constituted a mere technical deficiency—of form and not of substance—which does not vitiate the decree. Although the parties were afforded an opportunity to produce additional proofs considered relevant in the light of the principles laid down by this court, no further evidence was offered; and the decree, while advised by the vice-chancellor, was entered by the chancellor in conformity with what was conceived to be the mandate of this court.

We are thus brought to a consideration of the major question raised by defendants. Tenacious in the purpose to reduce complainants and associates in the so-called "junior" group to economic subjugation, they complain that the decree does not conform to our mandate, in that "the effect of annulling the contract of the juniors, is to require the restoration of the *status quo ante, i. e.,* the juniors revert to their original

position and &ast; &ast; &ast; status" of "permit-men." This is rested upon the asserted theory that, where there is "illegality of purpose," and the parties are in *pari delicto,* "the sole relief and full measure thereof, is the annulment of the contract in the interest of the public welfare—no more—no less." The further insistence is that the decree, in effect, accords to complainants a status higher than mere "permit-men," and therefore "declares a new contract for the benefit of complainants," and deprives defendants of the "unalienable right of liberty to contract" guaranteed by the fourteenth amendment to the federal constitution.

We find these criticisms to be groundless. The decree is predicated upon lawful obligations arising out of what is primarily and essentially a contract of membership in the union. The obligations thus enjoined upon the parties are wholly conventional in character; the decree in nowise constitutes a judicial imposition of terms not embraced in the undertakings of the parties. The inquiry concerns the nature and scope of the contractual engagements; and in this quest for the common intention of the parties, their situation and the accompanying circumstances are to be considered. The court must regard the relation of the parties and the surroundings when the contract was made, and the objects which they were thereby striving to attain. *Corn Exchange Bank* v. *Taubel, 113 N. J. Law 605.* This is the rule whether the agreement be integrated or unintegrated. *Contracts, A. L. I.* § *235; Williston on Contracts* §§ *607, 609, 617, 618, 629.*

The International Alliance, as is common with associations of like purposes, is composed of collective units, termed "locals," and the individual membership thereof. Its constitution and by-laws make express provision for this individual membership, and prescribe the qualifications therefor. Membership can be acquired only by the joint action of the local and the parent bodies. The by-laws of the Alliance (article two, sections 21, 23; article three, section 1) lay down as prerequisites to admission to membership (1) a demonstration, through examination, of the applicant's "competency and qualifications," and (2) the approval of the Interna-

tional's general secretary-treasurer; and the locals are enjoined accordingly.

Correlative rights and duties are granted to and imposed upon the individual members. They are required to pay a *per capita* tax, dues and assessments to the Alliance; and the local is charged with the duty of collecting from the member monthly dues of "not less than $1.85." The latter is permitted (by-laws, article two, section 11) to impose upon the individual members the obligation "to contribute a given percentage of their earnings, over and above the monthly dues;" but there can be no discrimination, in respect to such contributions, against the traveling or itinerant member of the international body, nor can a "charge" be imposed upon him for "the privilege of working" within the local's jurisdiction. Individual membership in the international society continues after the revocation of the local's charter for insolvency. It confers upon the holder the right to practice his trade under the protectorate of the parent association throughout its extensive territorial jurisdiction. And article two, section 19, of the latter's laws, while securing to the members of the affiliate local "all positions" within its jurisdiction, directs it, "in the event of the local membership being unable to care for all vacancies," to give preference in employment" to members of sister locals affiliated with this Alliance." It is therein laid down that "not until the available members of resident and out-of-town locals have been employed shall the engagement of non-members be permitted."

Concededly it was the operation of this provision that led to the conferring of a membership status upon complainants and associates, who, as pointed out in the earlier opinion, were in no sense apprentices or learners, but skilled mechanics who had acquired, under the tutelage of the local's members, the requisite operating proficiency following the advent of sound or "talking" pictures, which required a doubling of the projector operating force, and who were paid the prevailing union wage. At the outset, these men were given a "permit" to work under the local's supervision until such time, to adopt the language of appellant's counsel, "as the examining board of the local was convinced that these men were qualified and

sufficiently experienced in their trade." After a mastery of the operating technique had been acquired, they continued to work, under the local's supervision, as mere "permit-men," without the conventional membership status, in consideration of the payment to the local of ten per cent. of their earnings. In this position they were without the employment security accorded to members of the parent society. Itinerant members of that body, under the by-law referred to, were entitled to work in the local's territory to the exclusion of the permit-holders. This was a source of dissatisfaction to both the union and the exhibitors with whom it had contracts. It was regarded as an evil that required correction; and it was indubitably the essential purpose to completely obviate this distinction, and to accord to the permit-holder the membership requisite for its attainment. Obviously, this could be accomplished only by conferring upon complainants the sole membership status provided by the International's fundamental law; only thus could they be placed on the desired parity with the members of that body.

The consummation of this purpose took the following form: The case of Cameron is typical. Under date of June 15th, 1929, he filed the customary written application for unqualified membership. He was recommended "for membership" by four members of the local in good standing, as required by the then existing laws of the body. Stamped across the face was in the inscription "Junior Dept.," but it was admitted by Elvins, the local's "business agent," and the officer directly in charge of the applications for membership made by complainants and associates, that, at the time, neither a "Junior Department," nor anything of kin to it, was in contemplation. It was not until March 4th, 1930, that this concept came into being. And it was then that the endorsement referred to was affixed to the application. On the back of the application was stamped, under date of February 18th, 1930, the approval of the International's general secretary-treasurer, which in nowise conditioned the membership.

On March 4th, the applicant subscribed and "swore" to a writing entitled "rules governing membership, application

and agreement for Junior Dept. Local 384" of the international body. This document is the genesis of the relationship which is now the subject of inquiry. It gave birth to the "junior department;" it is upon this that the appellants must, in the final analysis, rely for their claim of "junior membership," separate and distinct from unconditional membership in the parent association. "Practical moving picture machine operators" of good character were thereby made eligible for membership. Applications were required to be filed at a regular meeting of the local, and voted on "by secret ballot." Members of the international body "from beyond the jurisdiction of this Union" were made eligible for "junior membership" upon presentation of a transfer card from his local union. It is to be remarked here that the constitution and laws of the parent association forbid such discrimination against the members of sister affiliates. The initiation fee was fixed at $500. The applicant was required to demonstrate his mechanical qualifications in "a practical examination." Members of the local were listed; and it was provided that they were to be recognized as "senior members," with "seniority rights over all other members with reference to employment." Again, it was provided that "junior members will at all times be subject to removal from jobs when such jobs are desired by senior members." Conditions for admission "to senior membership" were prescribed. And provision was made for meetings of the "junior members * * * to be conducted by the executive board of the senior body." The "junior members" were required to pay the *per capita* tax, insurance and all assessments imposed by international membership, and dues of ten per cent. of salaries earned. The usual "oath of obligation" was administered to the complainants; and they received a card, in the customary form, certifying to membership in the local union of the International Alliance, although on the margin was endorsed the phrase "Junior Dept."

It is evident from the foregoing that the parties were dealing with two separate and distinct relationships—the one fundamentally collective and lawful; the other essentially individual and, in the circumstances, unlawful.

*First:* Unconditional membership in the international society was indisputably comprehended. Such membership was requisite to put the incoming members on a parity with the old, in respect of the constitution and laws of that body, if the penalty of non-membership laid down in article two, section 19, were to be avoided. And it is conceded that this was the special purpose.

This association derives its authority from the contract of membership. The members are bound by the constitution and laws of the society in so far as they do not offend public policy or the law of the land, or contravene the fundamental scheme of the society itself. Such laws ordinarily measure the rights and powers, and obligations and duties, between the association and its members, and the latter *inter se.*

The constitution and laws of the international organization provide for only one class of membership. The members are all on a parity. And this was likewise true of the constitution and laws of the local at the time of the induction of complainants into membership. Appellants, apparently appreciating the force of this, seek to sweep aside the prohibitions of the local's fundamental law with the claim that the constitution and laws, adopted in 1923, had "become obsolete and outlived, outworn and impractical," and were therefore "not in force on March 4th, 1930," when complainants subscribed to the membership "rules" referred to, and were "obligated" to membership. But the local's basic law cannot be so readily disposed of. The local derives its authority from the charter granted by the International Alliance, and its own constitution and laws not inconsistent therewith; and these essential laws continued in full force until repealed or modified in the conventional mode.

Nor could there be, as we have held, a lawful classification that constituted a deprivation of the constitutional rights of liberty and property of a group of members to serve the individual interests of the remainder. This is the direction of the power springing from the combine to the service of individual ends merely, and is therefore an abuse of power. Such would thwart the fundamental purpose of the union, and

frustrate public policy. The function of a trade union is to increase the individual bargaining power by collective action; the authority conferred upon such an organization must be addressed to the advancement of the common interest and general welfare of its members. These individual constitutional rights may be limited only to the extent necessary to subserve the public interest.

While conceding that the purpose was to confer on the permit-holder a status, recognized by the International, that would place him on a parity with the members of that body in respect of the employment privileges referred to, counsel term this relationship "a limited standing as apprentices," and frankly concede that the "senior members" were thereby reserving a preference in employment deemed "fair and equitable" under the circumstances. This is plainly a contradiction in terms. Complainants were not, at the time of admission, apprentices or probationers in fact; they were skilled mechanics who had demonstrated their proficiency, and admittedly had all the qualifications for membership. Yet such seems to have been their status, and consequently they were not entitled to the employment rights accorded to the one membership class recognized by the organic laws of both the International and its local affiliate. The International's constitution is silent as to apprentices, and its by-laws (article three, section 12) provide only for the payment of a *per capita* tax "on all apprentices." And article two, section 18, thereof explicitly classifies the apprentice as a' "non-member" in respect of the employment privileges. Moreover, as pointed out, a demonstration, through an examination, of the applicant's "competency and qualifications" is a prerequisite to membership.

Again, appellants are led into error that emphasizes the existence of the fundamental relationship now denied. It is said that on March 4th, 1930, the "permit-men" were advised "that they would have no more rights than they had as 'permit-men' only with the one benefit that it would be impossible for any outsider to come in, and secure their positions;" and then counsel go on to argue that, "as a matter of fact, the

'permit-men' secured no more rights after they signed the contract than they had prior thereto." That being so, there was no reason for the contract at all. It is not to be presumed that the parties intended a vain and wholly unnecessary thing; rather it is to be supposed that they had in mind a change in their relations. An agreement imposing a binding obligation refers to legal relations; the parties contemplate the assumption of legal rights and duties. *Broad Street National Bank of Trenton* v. *Collier, 112 N. J. Law 41; affirmed, 113 N. J. Law 303.* A construction that gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to one which renders the contract unreasonable, unlawful, useless or inexplicable. *Williston on Contracts* § *619; Contracts, A. L. I.* § *236.*

Thus it appears that the only substantial difference between the "seniors" and "juniors," under the rules and regulations, incorporated in the original contract, was in the employment preferences reserved to the former. Membership in the union was the undoubted objective. The underlying considerations were the mutual benefits to the members growing out of the combine to advance the common cause. The membership of these skilled mechanics manifestly furthered the collective interest; and the incoming members were, by the same token, to be advantaged by the benefits accruing from the common enterprise. This was indubitably the primary purpose.

*Second:* But the existing membership, or a group thereof, employed the power of the combination to secure these arbitrary and unreasonable individual employment preferences. The classification was designed to effectuate these preferences, and invaded, as we have held, what in the respective spheres of federal and state action are regarded as the fundamental rights of the complainants. These provisions were plainly contrived to further not the common cause, but the individual interests of those who, through temporary control of the body, had the power to impose such exactions upon the incoming members, and embraced the opportunity. This was not in the service of the common interest; the advantages thus secured by the seniors had no relation to the attainment of the lawful objects of the combine. These provisions were directed

to the gaining of special individual benefits at the expense of the incoming members, as distinguished from those naturally and legitimately flowing from the combination. They were stipulations extra the membership contract. The seniors arrogated to themselves, with no pretense of service to the common cause, the power to control their incoming associates in the exercise of their fundamental right to earn a livelihood. Finding it expedient to accord union membership to the permit-holders, they sought, by this wholly unwarranted classification, at variance with the structures of the international and local bodies, as well as violative of public policy, to secure privileges entirely foreign to the basic laws of both bodies and the lawful concept that gave them being and justifies their existence. The classification was purely local in scope and character to make effective the employment preferences, and bore no relation to the fundamental international membership, which rests upon the principle of united action for the common welfare.

The parenthetical notation of the abbreviation "appren." on the registration card, made by a clerk in the parent body's general office, was concededly his understanding of the import of the endorsement "Junior Dept." on the local's membership report. It was a misinterpretation; and it did not operate to change the character of the relationship. It did not modify the approval of unconditional membership in the parent body by its general secretary-treasurer, in accordance with its laws, which make no provision for a "junior department," "junior membership," or "junior local." The endorsement was a designation of local significance purely; it did not relate to the fundamental international membership. It was not the province of the clerk to thus depart from the report submitted by the subordinate unit, and his doing so is of no moment. It is noteworthy that the card contained the entry—"Date of original initiation in I. A., March 4, 1930," and that the member admittedly assumed all the obligations of unconditional membership, including the payment of all dues, assessments and insurance premiums. Respondents were in fact recognized by the international body as full fledged members, and not as apprentices.

And so, the revision of the constitution and laws of the local union adopted on May 12th, 1931, was entirely nugatory. It is to be observed, in passing, that, without the assent of complainants, membership restrictions in respect of the local's affairs were thereby engrafted upon that body's organic law, although not sanctioned by the original draft of rules and regulations subscribed by them. These restrictions are set out in the opinion heretofore filed, and need not be repeated here. *118 N. J. Eq. 17 et seq.* It suffices to say that, as pointed out in that opinion, complainants and associates were, by virtue of the stipulations thus embodied in the fundamental law, "under the absolute control of" the local body, but "in no sense part of it." Such was clearly not the purpose expressed in the basic writing.

*Third:* Yet, if these condemned provisions be regarded as a part of the contract of membership, they are essentially subsidiary in character. For the reasons stated, they did not, in any real sense, constitute the primary inducement to the contract of membership. They are separable from the lawful fundamental provisions thereof, and therefore do not invalidate the whole undertaking.

Trade union membership is essentially a contract in restraint of trade. *Williston on Contracts* §§ *1633, 1652, 1654, 1655.* In so far as the individual member is concerned, it restricts him in the pursuit of a gainful occupation. To the extent that the combination strives, through peaceable and lawful means, to secure what it conceives to be an adequate wage scale, or more favorable working conditions, or otherwise to advance the common interest in a lawful field, the incidental restraint of trade is classified as reasonable. While a stipulation imposing an unreasonable restraint of trade is illegal, and therefore unenforceable, it is the rule, well grounded in our jurisprudence, that, where a contract contains a promise in reasonable restraint of trade and one in unreasonable restraint, the former promise is enforceable, unless the entire agreement is part of a plan to obtain a monopoly obnoxious to the law. It is only where the full performance of a promise indivisible in terms would involve unreasonable restraint, that the promise is illegal, and not

enforceable in any part. See *Contracts, A. L. I.* § *518; Williston on Contracts* §§ *1659, 1779.* Where disregard of the illegal provision will not defeat the "primary purpose of the bargain," the contract can be enforced, without the illegal provision, by a party thereto who is not guilty of "serious moral turpitude," unless prohibited by statute. *Contracts, A. L. I.* § *603.*

And it is equally well settled that, if refusal to enforce or rescind an illegal bargain would work injury to parties for whose protection the law makes the bargain illegal, enforcement or rescission, as the case may be, is awarded. *Contracts, A. L. I.* § *601.* And this is especially so when the injury is to the public. Enforcement of an agreement may be decreed where its refusal would produce the very effect which the law seeks to guard against. *Williston on Contracts* § *1632.* Considerations of public policy to which we have adverted render these principles apposite here. See *McCarter* v. *Firemen's Insurance Co., 74 N. J. Eq. 372; Pom. Eq. Jur. (3d ed.)* § *942; 6 R. C. L. 829.*

Let the decree be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 12.

*For reversal*—None.