CARL H. TESSMAR, EXECUTOR OF THE ESTATE OF ERNST L. KADISCH, M.D., DECEASED, AND SHIRLEY KADISCH, PLAINTIFFS-RESPONDENTS, v. PAUL L. GROSNER, M.D., DEFENDANT-APPELLANT.

Argued November 19, 1956—Decided January 14, 1957.

*Mr. George F. Losche* argued the cause for the appellant (*Messrs. Losche and Losche,* attorneys).

*Mr. Albert S. Gross* argued the cause for the respondents (*Mr. Nelson G. Gross* on the brief).

The opinion of the court was delivered by
OLIPHANT, J.  This is an appeal from a judgment of the Superior Court, Chancery Division, in favor of the

plaintiffs-respondents awarding to the plaintiff-executor the sum of $2,500 as damages for the conversion by the appellant of certain medical charts and records compiled and owned by the deceased Dr. E. L. Kadisch during his life and professional practice.

The action was originally brought by the plaintiffs to restrain and enjoin the defendant doctor from engaging in the practice of medicine and dermatology in Bergen County and from using the information obtained from the charts and records of the decedent, Dr. Kadisch, and praying for an accounting of all income and profits made by him from the operation of the appellant's medical practice, and to compel the defendant to pay to the plaintiffs the damages representing the loss in value of the medical practice of Dr. Kadisch. At the trial all claims for relief except that for damages for the conversion and use of the charts and records were abandoned.

Dr. Kadisch was a licensed physician and had practiced dermatology for seven years at his residence in Westwood, New Jersey. He became ill in July 1954 and was unable to practice after September 20, 1954. On that date Dr. Kadisch and the defendant entered into a written contract whereby the defendant was to take care of the practice during Dr. Kadisch's illness, seeing patients two days a week, and was to receive $40 a day for his services. Dr. Kadisch died on September 28, 1954 and thereafter the defendant continued in this arrangement until November 1, 1954, and Mrs. Kadisch collected the proceeds of the medical practice and paid the defendant the stipulated sum of $40 a day.

In discussion with the appellant Mrs. Kadisch made it clear, and it does not seem to be disputed, that she and the executor contemplated selling the house at Westwood together with the equipment, together with the list of patients to some doctor who would be interested in establishing a practice as a dermatologist, and she sought to interest the defendant in such purchase. But in the interim she negotiated with the defendant a new arrangement or contract

which was informally and orally entered into with the approval of the respondent-executor, whereby the defendant was to pay the sum of $200 a month for the use of the three-room offices in the home at Westwood, together with the equipment therein, including medicine, files and charts. It seems not to be disputed that this was just a temporary arrangement. There is a dispute as to whether it was terminable on a two months' notice or a one months' notice, and also there was a sharp conflict as to whether the agreement contained a provision that the appellant was not to engage in private practice as a dermatologist within close proximity of the Westwood location until after the house and practice were sold. Defendant denies any such collateral agreements, but they are unimportant here since the counts of the complaint relative to the restraint have been abandoned.

The gist of the agreement was that the defendant was to carry on the practice heretofore carried on by the deceased Dr. Kadisch at this location, and under the terms of the contract he simply had to pay $200 a month. Incidental and as part of this agreement the defendant, apparently with Mrs. Kadisch's approval, sent out cards in December 1954 announcing he was taking over the practice of Dr. Kadisch at the office in Westwood. At that time he sent out about 1,000 announcements, but apparently there were more names in the charts than those.

In the meantime Mrs. Kadisch was attempting to sell the home and office in Westwood, together with the equipment, and in addition to the defendant she had discussions with several other practitioners in the field of dermatology, but none of them made her a firm offer. The defendant seems to have taken a passive and negative attitude as to his interest in the property and practice; meanwhile, starting some time early in December, he had his secretary make a copy of the chart cards that were in Dr. Kadisch's office. It is significant that he only copied the names and addresses of the patients, together with their telephone numbers, the age of each patient and whether or not the patient

was a good or bad payer. He denied any interest in their medical history.

From the first of November until early in March 1955 he paid his $200 a month and carried on the practice at the Westwood residence. At that time Mrs. Kadisch apparently decided that he was not interested in purchasing the practice but his paramount purpose was to carry on the practice so that at the same time he could compile for his own use a list of all the patients. Under such circumstances she gave notice he should leave the premises on April 1, 1955. This he did and immediately opened an office in the Medical Arts Building in Westwood, and promptly sent out announcements to all the former patients of Dr. Kadisch from the list which he had compiled while occupying the Westwood office.

He very frankly testified that he sent 1,320 announcements of the opening of his office in the Medical Arts Building and that 1,150 of them went to patients whose names "I extracted from the files of Dr. Kadisch's office" which he considered "my property," "my rented property." He testified that while he could have procured the names out of the telephone book, it was important to him that he have the names of these people who suffered from dermatological conditions because they might need treatment again.

The trial court held the Kadisch estate had something of value in these charts and that the appellant as effectively took them by making copies as if he had taken them away and never returned them. He got all the value out of the charts that he saw in them. The trial judge held he had no right to that, nor the right to extract such information from these charts and take them elsewhere for that purpose; that he only had the right to use them in the office where he was carrying on the practice in the last few weeks of Dr. Kadisch's life and during the five or six months that he used the office under the lease agreement. Such use of the charts as he made of them after copying the names and addresses was not in accordance with the purpose of the agreement and was in violation of the property rights

of the executor in them. The judge concluded that the plaintiff-executor had suffered damages of $2,500 and ordered judgment entered in that sum payable to the executor with costs.

The appellant argues he was given the right to use the charts for the purpose for which he used them, that he paid $200 a month for the use of the charts as part of the office and its facilities, and if there was to be a limitation on their use, it should have been a part of the agreement; and further, that from November 1, 1954 on the charts were rented or bailed to him.

The appellant then argues the practice of a physician is a thing so purely personal, depending so absolutely in the confidence reposed in his personal skill and ability, that when he ceases to exist it necessarily ceases also; that the good will and practice are one and the same thing and that after his death neither can have an intrinsic or market value, citing *Mandeville v. Harman*, 42 *N. J. Eq.* 185 (*Ch.* 1886). He takes the position that the good will could not attach to the medical charts because Dr. Kadisch was already dead, the charts had lost their exclusive association with him, and there was no longer a possibility that the patients listed on the charts would go to the Westwood address expecting to avail themselves of Dr. Kadisch's skill. Finally, he argues that the disclosure of the information on the charts to the appellant, Dr. Grosner, had been complete and without limitation.

We agree with the trial court that these charts had a value not only to Dr. Kadisch's estate but also to the appellant in his practice as a dermatologist. It is not an uncommon thing for a doctor in advanced years, prior to retirement, to dispose of a medical practice to a younger doctor, and it seems to us to be the commonsense thing that in such a disposition, if the records and charts are not included, the valuation is depreciated.

It would be unrealistic to suggest that all value attributable to a medical practice instantly disappears upon the death or retirement of the physician concerned. The

appellant recognized some value in the charts and records, for he was willing to pay for their use. The situation also gives rise to ethical considerations but to an extent we need not explore. See, generally, Note, "The Death of a Lawyer," 56 Columbia L. Rev. 606 (1956). We deal with a contract which the parties have made and not with ramifications which might arise from a professional code which has not been introduced to us.

In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. Cameron v. International, etc., Union No. 384, 118 N. J. Eq. 11 (E. & A. 1935); Mantell v. International Plastic Harmonica Corp., 141 N. J. Eq. 379 (E. & A. 1947); Heuer v. Rubin, 1 N. J. 251 (1949); Casriel v. King, 2 N. J. 45 (1949); Owens v. Press Publishing Co., 20 N. J. 537, 543 (1956).

Even where the intention is doubtful or obscure, the most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted, International Signal Co. v. Marconi Telegraph Co. of America, 89 N. J. Eq. 319 (Ch. 1918), affirmed 90 N. J. Eq. 271 (E. & A. 1919), so that neither will have an unfair or unreasonable advantage over the other. Washington Construction Co., Inc. v. Spinella, 8 N. J. 212, 217 (1951). These rules apply in all circumstances, whether the agreement be integrated or unintegrated. Cameron v. International, etc., Union No. 384, 119 N. J. Eq. 577, p. 581.

After examining all the testimony we have not been persuaded that the patients' cards or charts were unrestrictedly turned over to the appellant at the time he went into possession of the office in Dr. Kadisch's residence in November 1954. On the contrary, it is our impression that these charts, together with the other personal property and equipment, were turned over to him as an incident of the

leasing of these particular premises to him for the purpose of permitting him to carry on a practice as a dermatologist there. That in conjunction with the leasing of the real estate and as an incident thereto, there was a bailment of the office equipment and these charts, which were put into his hands for a very special purpose to aid him during the lease to carry on his practice of dermatology at that particular location and to be returned once that purpose was accomplished or the lease terminated. *Cf. Gilson v. Pennsylvania R. Co.,* 86 *N. J. L.* 446 (*Sup. Ct.* 1914), affirmed 87 *N. J. L.* 690 (*E. & A.* 1915). Nor can we find any evidence in the testimony of any intention to confer full title or unqualified possession of the charts upon the appellant.

We find that both the use of the real and personal property was treated by the parties under the terms of the contract as an integrated whole. We do not find anything that could cause the appellant to conclude that he had the right to extract the information which he did from the charts and use it unrestrictedly for his own advantage. Having done so he breached the contract, and having breached it he was liable in damages for the conversion of the charts to his own use to the detriment of the respondents. *Cf. Mueller v. Technical Devices Corp.,* 8 *N. J.* 201 (1951).

The appellant then argues there was no evidence from which the court below was justified in awarding more than nominal damages against the appellant. Relying on *Mandeville v. Harman, supra,* he argues that the likelihood the patients would return for treatment just because another physician occupied the same office would be just a slight possibility, and that in an action for the conversion of chattels the rule of damages is limited to the value of the chattels converted. That this is a general principle is conceded, but damages should not be denied simply because the application of this rule may in a given situation be a little more difficult than usual.

There is testimony in this case by a doctor engaged in the practice of dermatology as to what he considered the

value of this practice at a time when he was considering purchasing it. There is also testimony as to the value at which Mrs. Kadisch had offered the practice for sale to other doctors; this price included the house, all the office equipment and the charts. We have also the monthly rental value of the entire property and the practice as paid by the appellant, together with the gross income of Dr. Kadisch for several years.

██ Since there is no market value, as such, for charts of this kind, the general rules of damages for the breach of contracts can be applied more readily than the specific rule above stated. But the general rule of damages for a breach of contract is subject to two qualifications designed to confine within reasonable limits the appraisement of the consequences of the default; (1) the damages are those arising naturally according to the usual course of things from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as a probable result of the breach; and (2) there must be reasonably certain and definite consequences of the breach as distinguished from the mere quantitative uncertainty. *Weiss v. Revenue Building & Loan Ass'n,* 116 *N. J. L.* 208, 210 (*E. & A.* 1936); *Marcus & Co., Inc. v. K. L. G. Baking Co., Inc.,* 122 *N. J. L.* 202 (*E. & A.* 1939).

██ If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient. *Wolcott, Johnson & Co. v. Mount,* 36 *N. J. L.* 262, 272 (*Sup. Ct.* 1873), affirmed 38 *N. J. L.* 496 (*E. & A.* 1875). The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. *Oliver v. Autographic Register Co.,* 126 *N. J. Eq.* 18, 25 (*Ch.* 1939); *Weiss v. Revenue Building & Loan Ass'n, supra; Wolcott, Johnson & Co. v. Mount, supra.*

Under the rule stated and under the proofs we do not find that the trial court erred as to the extent of the damages; they are not excessive, and there is some reasonable basis for the finding in the proofs. Under such circumstances we will not disturb the result.

As to the final point as to costs, the plaintiff-respondent was entitled to costs.

Affirmed.

VANDERBILT, C. J. (dissenting). The majority view fails to consider the effect of the consent given by Dr. Kadisch's widow to the defendant, as part of the rental arrangement she made with the defendant for the doctor's office with the consent and approval of the executor, to send out announcements to Dr. Kadisch's patients notifying them that the defendant had taken over the doctor's practice. This fact, it seems to me, took away the real value the records had for any future purchaser of the doctor's practice.

These chart cards have some value in furnishing information about the patients concerned, but only to the doctor who is able to attract and hold these patients as his own. Thus, the real value in them to the new doctor lies in the right to announce to these persons that he has taken over the practice of their former physician, hoping they will be induced thereby to transfer their patronage to him. But the successive announcements of such a disposal of a deceased doctor's practice to different doctors tend to destroy any possible value that might have attached to a single announcement.

The widow having once permitted the announcement that the defendant had taken over Dr. Kadisch's practice, it is hard to conceive that there was any real value left in the ability to announce that still another had taken over the practice. Consequently, though the defendant acted improperly in converting the names to his own use, what he converted was, to my way of thinking, of nominal value only.

I would modify the award of damages below to limit it to six cents.

*For affirmance*—Justices HEHER, OLIPHANT, WACHEN-FELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Chief Justice VANDERBILT—1.