**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0596-19T3

EMERSON REDEVELOPERS
URBAN RENEWAL, LLC,

      Plaintiff-Appellant,

v.

LAUREL CHINESE
RESTAURANT II, LLC and
CAIQUI ZHENG,

      Defendants-Respondents.

_____

Argued October 27, 2020 — Decided  November 9, 2020

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Special Civil Part, Bergen County, Docket No. LT-004022-19.

Michael W. O'Hara argued the cause for appellant (Bisgaier Hoff, LLC, attorneys; Michael W. O'Hara, on the briefs).

Keith S. Barnett, attorney for respondents.

PER CURIAM

Plaintiff Emerson Redevelopers Urban Renewal, LLC appeals from an October 17, 2019 order dismissing its complaint for summary dispossession and termination of a commercial tenancy. We vacate the order and remand for a hearing.

Plaintiff acquired a commercial property in Emerson in April 2019 and contracted with the Borough of Emerson to redevelop the property. Prior to plaintiff's acquisition, the property was owned by 182 Emerson LLC (landlord) who, in 2007, leased a portion of it to Laurel Chinese Restaurant, LLC (Laurel I). The landlord and Laurel I entered into a First Amendment to Lease in January 2012, which extended the lease to 2022. In 2015, Laurel I changed its name to Laurel Chinese Restaurant II, LLC (Laurel II), and assigned its interest to Laurel Chinese Restaurant Inc. (Laurel Inc.) and its proprietor Min Cao. In November 2016, Laurel Inc. and Cao assigned their interest as tenants to Caiqui Zheng by way of an Assignment and Modification of Lease (AML).

The AML is the subject of this appeal. It was a three-party agreement signed by landlord, Laurel Inc. and Cao, and Zheng. In it, the landlord expressly agreed Laurel Inc. and Cao could assign their rights to Zheng, contrary to the lease's prohibition on subletting. The landlord agreed to extend the term of the lease to 2026. The parties also amended the lease to state:

> In the event of any taking of the [p]remises or the building designated as retail shopping center, [l]andlord shall be entitled to receive the entire award and [t]enant hereby assigns to [l]andlord any and all right, title and interest of [t]enant in or to any such award or any part thereof and hereby waives all rights against [l]andlord. Landlord ha[s] the right to terminate the lease at any time by giving [t]enant a notice of 90 to 120 days to cancel the lease and getting back the store location[.]

Zheng began occupying the premises and operating his restaurant in December 2016. In February 2019, the landlord served a notice to quit/notice terminating tenancy on Zheng and Laurel II, which terminated the lease effective May 31, 2019. Plaintiff acquired the property in April 2019. When Zheng refused to surrender the property, plaintiff filed its complaint in June 2019.

The parties' initial court appearance was rescheduled because Zheng had not retained counsel. When the parties returned to court, the trial judge instructed plaintiff to file a brief addressing whether the AML was an illusory contract. Although neither party filed a motion, plaintiff's counsel complied with the judge's instructions and filed its brief followed by Zheng's counsel.

The parties also filed certifications in which they disputed the facts surrounding the negotiation and execution of the AML. Plaintiff presented a certification from the landlord who indicated he personally negotiated the lease.

A-0596-19T3

He stated Cao contacted him regarding assigning the lease to Zheng, who was Cao's relative. The landlord certified he

> never met . . . Zheng and had no knowledge of his educational or professional background, or his work experience . . . [or] his financial status or creditworthiness, or his ability to manage or operate a restaurant.
>
> . . . Because I was unfamiliar with . . . Zheng . . . I was hesitant to agree to permit him further assignment of the [l]ease.

The landlord further certified he was personally engaged in the negotiations with Cao and Zheng regarding the proposed assignment and "Zheng was represented by counsel, who I understood to be Tina Tang, Esq." The landlord certified that due to Zheng's lack of prior experience owning or managing a restaurant, he

> was not satisfied that the financial information provided . . . demonstrated . . . Zheng would be able to satisfy the rent obligation for the proposed extended term of the [l]ease.
>
> . . . However, given my relationship with Min Cao and Joanne Shi[1], and based on their representations to me, I decided to provide consent to the [AML] to . . . Zheng. However, . . . I advised . . . Cao and . . . Zheng that any [a]ssignment [a]greement must include a termination provision that would provide the landlord with the right

---

[1] The landlord's certification asserted he "understood [Cao] to be . . . Shi's husband".

A-0596-19T3

> to terminate the [l]ease with . . . Zheng for any reason if proper notice is provided.
>
> . . . Cao and . . . Zheng advised me that . . . Zheng would agree to the proposed termination provision if the [AML] was granted, and on that basis I agreed to accept the [AML].
>
> . . . .
>
> . . . It was my understanding that . . . Zheng's attorney . . . approved the [AML] and completed the transaction for . . . Zheng and . . . Cao.

Zheng also filed a certification in which he disputed the salient facts. He certified "I do not converse in the English language and . . . Chinese/Mandarin is my native dialect[.]" His certification disputed the termination language was included in the AML because of the landlord's concerns about his credit and lack of experience. He attached a credit report showing his credit rating was good as of June 19, 2019 and certified "at the time I was interested in leasing the subject property my credit score was even higher[.]" He certified he was never the subject of a debt collections suit and had never filed for bankruptcy. He also stated he "had considerable experience in the restaurant business before [he] leased [pursuant to the AML]."

Zheng disputed other basic facts. Contrary to the landlord's certification, Zheng certified "I am not related in any way to . . . Cao." He stated "I did not

5

engage in any negotiations regarding the [AML]. . . .  Initially, it was . . . Cao and his wife . . . [who] approached [the landlord] about assigning their lease to me."  Zheng denied having an attorney, certifying "[a]s far as any claims about my being represented by a Tina Tang, Esq., I do not know such [a] person."  He claimed he never retained an attorney and the landlord's attorney prepared the AML, gave it to him and Cao, and "requested that we find a [n]otary and sign the [AML.]"

Importantly, Zheng certified as follows:

> Although I was aware of the termination provision contained in the [AML], I thought I had no choice but to sign this document if I wanted to have the landlord's permission to lease the property and operate a restaurant.
>
> . . . Because the lease was for [a] period of ten years and provided for an option of an additional five years, it seemed very unlikely that my lease would be terminated any time soon.

Zheng also cited the fact he invested $120,000 to purchase the restaurant and claimed he had been deceived into executing the [AML] and "[h]ad [he] known of the landlord's real intentions to demolish and develop the subject property, [he] would not have entered into [the AML]."

Counsel and the parties appeared for oral argument in August 2019.  When the judge asked counsel whether the AML's language could be stipulated into

6

evidence, both agreed and advised the judge there was no need for testimony regarding the terms of the AML. Although the judge announced he was ready to rule, he proceeded to debate facts regarding the formation of the AML with counsel, namely, Zheng's experience in interpreting or drafting leases and the parties' respective bargaining power, whether Zheng was represented by counsel, whether there was consideration for the AML's termination provision, the length and complexity of the AML, the fairness to Zheng in terms of the money invested in the restaurant, and plaintiff's motives for terminating the lease. The judge concluded as follows: "The question is . . . whether or not this is an illusory provision and it may or may not be. But the scales tilt . . . in . . . favor of the tenant here because there is no counsel on site. It's not a level playing field." The judge dismissed the complaint without prejudice and ordered the parties to submit an order.

The parties could not settle the form of the order and returned to court four weeks later. Although the judge expressed his order was "simple" and could not understand why the parties could not resolve it, he took the opportunity to amplify his findings. He questioned the enforceability of the AML stating: "[H]ow could have there been a meeting of the minds when there's a law firm on one side and [Zheng] doesn't even speak English[?]" The judge again

A-0596-19T3

questioned whether Zheng had counsel and concluded this was the only factual dispute. The judge stated he would sign an order citing the findings he placed on the record and transmit it to the parties at a later date.

Plaintiff filed its notice of appeal on October 9, 2019. Eight days later, the judge amplified his findings again. Citing Bryant v. City of Atlantic City[2], the judge concluded the AML was unenforceable because it imposed "no obligation on the part of the landlord to perform." The judge said he "depended entirely" on the parties' certifications and found Zheng's persuasive. He concluded Zheng "was not represented by counsel at the time of the execution of the [AML]" and accepted Zheng's representations he did not understand English. He rejected plaintiff's claims it negotiated the termination provision in the AML as consideration for Zheng's lack of credit worthiness and business experience. The judge concluded this did not constitute consideration because Zheng's financial status and business experience pertained to his ability to pay the rent, against which the landlord was protected because "the landlord could just bring a non-payment case." The judge found Zheng's assertion he would never have signed the lease if he knew the landlord intended to redevelop the property "rings far more true to the [c]ourt than does the opposing argument of

---

[2] 309 N.J. Super 596 (App. Div. 1998).

A-0596-19T3

the plaintiff." The judge concluded "there was no level playing field here" because Zheng "did not have a complete understanding of what he was signing," and "there was no meeting of the minds and this is what led . . . to this contract being illusory."

On appeal, plaintiff argues the judge erred in concluding the AML termination provision is unenforceable because Zheng voluntarily signed the lease and was aware of the provision, there was no evidence of fraud, and the judge raised the illusory issue sua sponte. Plaintiff argues the AML is not illusory because, pursuant to the covenant of good faith and fair dealing, defendants had an obligation to honor it, a party can reserve termination rights to itself, the parties partially performed, and the termination provision was in consideration for plaintiff modifying the lease to permit an assignment. Plaintiff argues the judge re-wrote the AML, and Bryant is distinguishable because here there was advance notice of the termination provision and partial performance. Plaintiff asserts the judge decided the case without either party having formally filed a motion. Notwithstanding the absence of a formal motion, plaintiff argues the judge did not apply the Rule 4:6-2(e) standard and instead decided the matter on conflicting certifications without a hearing.

We typically defer to the factual findings of a trial judge because they comprise "credibility determination[s] and the judge's 'feel of the case' based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare v. Cesare, 154 N.J. 394, 411-13 (1998)). We review questions of law de novo. Manalapan Realty v. Twp. Comm. of the Twp. of Manalapan, 140 N.J. 366, 378 (1995).

Our Supreme Court stated:

> As a general rule, courts should enforce contracts as the parties intended. Henchy v. City of Absecon, 148 F. Supp. 2d 435, 439 (D.N.J. 2001); Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960). Similarly, it is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties. Tessmar v. Grosner, 23 N.J. 193, 201 (1957). The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the "expressed general purpose." N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 302 (1953); accord Dontzin v. Myer, 301 N.J. Super. 501, 507 (App. Div. 1997) . . . .
>
> [Pacifico v. Pacifico, 190 N.J. 258, 266 (2007).]
>
> In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under

A-0596-19T3

which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. Cameron v. Int'l, etc., Union No. 384, 118 N.J. Eq. 11 (E. & A. 1935); Mantell v. Int'l Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947); Heuer v. Rubin, 1 N.J. 251 (1949); Casriel v. King, 2 N.J. 45 (1949); Owens v. Press Publ'g Co., 20 N.J. 537, 543 (1956).

Even where the intention is doubtful or obscure, the most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted, Int'l Signal Co. v. Marconi Tel. Co. of Am., 89 N.J. Eq. 319 (Ch. 1918), aff'd, 90 N.J. Eq. 271 (E. & A. 1919), so that neither will have an unfair or unreasonable advantage over the other. Wash. Constr. Co., Inc. v. Spinella, 8 N.J. 212, 217 (1951). These rules apply in all circumstances, whether the agreement be integrated or unintegrated. Cameron v. Int'l, etc., Union No. 384, 119 N.J. Eq. 577, p. 581.

[Tessmar v. Grosner, 23 N.J. 193, 201 (1957).]

The Court stated:

Any number of interpretative devices have been used to discover the parties' intent. These include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct. Several of these tools may be available in any given situation — some leading to conflicting results. But the weighing and consideration in the last analysis should lead to what is considered to be the parties' understanding.

[Kearny PBA Local # 21 v. Kearny, 81 N.J. 208, 221 (1979).]

In Bryant, the plaintiffs, a group of Atlantic City "residents, taxpayers, and interested associations" filed a complaint in lieu of prerogative writs, which challenged the city's plans to give land in its marina district to a developer to rehabilitate. 309 N.J. Super. at 602-03. The city and the developer entered into a memorandum of understanding, which permitted the developer to cancel the agreement if the costs to remediate the site became excessive, the developer could not obtain a certain type insurance, or if a bypass was not built. Id. at 608-09. Plaintiffs argued the numerous contingencies in the agreement rendered it illusory. Id. at 620. The trial judge disagreed, and we affirmed, concluding the agreement was not illusory because the developer did not have unfettered discretion to terminate it due to the contingencies. Id. at 621.

We stated:

> [A]n illusory promise is one in which the "promisor has committed himself not at all." J.D. Calamari and Joseph M. Perillo, Contracts, § 4-17 at 159 (2d ed. 1977). Thus, if performance of an apparent promise is entirely optional with a promisor, the promise is deemed illusory. Id. at 160.
>
> A promise is not illusory "if the power to terminate is conditioned upon some factor outside the promisor's unfettered discretion, such as the promisee's non-performance, or the happening of some event such

as a strike, war, decline in business, etc." Id. at 161. In general, our courts should seek to avoid interpreting a contract such that it is deemed illusory. Russell v. Princeton Lab., Inc., 50 N.J. 30, 38 (1967); Nolan v. Control Data Corp., 243 N.J. Super. 420, 431 (App. Div. 1990).

[Bryant, 309 N.J. Super. at 620-21 (emphasis added).]

The Supreme Court has emphasized that, even where a contract contains unilateral language, a court should avoid construing it as illusory. The Court stated:

> [W]here an arrangement gives rise to contractual rights, as distinguished from a mere hope for a gratuity, the majority of the courts hold that provisions purporting to give finality to corporate or committee decisions will not support arbitrary action. . . .
>
> A contract should not be read to vest a party or his nominee with the power virtually to make his promise illusory. Especially must this be so when a forfeiture will follow. It is appropriate to apply the rule to which a trustee is subjected, that notwithstanding the apparent finality with which the instrument clothes his action, he must stay within the bounds of a reasonable judgment.
>
> [Russell v. Princeton Labs., Inc., 50 N.J. 30, 38 (1967) (citations omitted).]

In <u>Nolan v. Control Data Corp.</u>[3], plaintiff, a computer salesperson, sued defendant, his employer, arguing his employment contract was illusory because it permitted defendant to alter the sales quotas and thus plaintiff's compensation "retroactively, currently or prospectively without notice and presumably without reason." <u>Id.</u> at 421. The trial judge agreed and concluded "'[t]he law governing [his] employment contract allows [him] no protection against the employer's unilateral modifications in compensation.'" <u>Id.</u> at 428. We disagreed and held "this absolute and unfettered power in the contract must be exercised in good faith and for legitimate business reasons so as not to deprive an employee of the fairly agreed benefits of his labors." <u>Id.</u> at 421-22. We reasoned the

> basic precepts of contract interpretation militate against our finding that [defendant's] sales plans conferred upon it the absolute, unfettered discretion to amend its compensation scheme retroactively at any time and for any reason whatever. Rather, a more reasonable and constrained construction of the contract is indicated. While [defendant] suggests that the language of its sales plans bestows upon it virtually limitless powers, we must seek to determine whether such an interpretation ever was within the fair contemplation of the parties.
>
> [<u>Id.</u> at 432.]

---

[3] 243 N.J. Super. 420 (App. Div. 1990).

With these principles in mind, we conclude the trial judge erred when he found the AML termination provision illusory without a hearing. The parties disputed several material facts, which impacted upon the discernment of their common intent. The disputed facts concerned how the contract was formed, namely, whether Zheng was represented, if he understood English, and was competent to contract for the termination provision. Moreover, the parties' understanding regarding consideration was also not settled by the dueling certifications submitted to the trial judge. Fundamental questions persisted regarding the termination language, namely, whether Zheng knew of plaintiff's intentions to redevelop the property and still contracted for the language, or whether he contracted for it due to poor credit worthiness and lack of restaurant industry experience. Finally, there was a question of whether by renting to Zheng for more than two years before terminating the lease, plaintiff had operated in good faith considering Zheng claimed he invested substantial sums into the property. A hearing was necessary to resolve these facts before the judge could invalidate the termination provision. For these reasons, we vacate the order and remand for a plenary hearing.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0596-19T3