**UNIHEALTH, Plaintiff,**

v.

**U.S. HEALTHCARE, INC. and The Health Maintenance Organization of New Jersey, Inc., Defendants.**

**Civil Action No. 95–6037(WHW).**

United States District Court, D. New Jersey.

July 10, 1998.

---

Kevin R. Jespersen, Slattery, McElwee & Jespersen, Short Hills, NJ, for Plaintiff.

## OPINION

PISANO, United States Magistrate Judge.

This case concerns a contract dispute between plaintiff, Unihealth, and defendants, U.S. Healthcare, Inc. and The Health Maintenance Organization of New Jersey, Inc. Unihealth represents the Meadowlands Hospital Medical Center, which entered into a "Hospital Services Agreement" with the defendants in 1991. Pursuant to this agreement, Meadowlands Hospital was to provide hospital services to enrollees in U.S. Healthcare's health maintenance organization in exchange for U.S. Healthcare's payment for said services. On November 28, 1995, Unihealth brought this suit against defendants, alleging that defendants breached their contract by failing to make proper reimbursements according to the terms of the contract. A non-jury trial was held before the Court on February 10 and February 11, 1998.

For the reasons discussed herein, the Court finds that: (1) the repeal of the former governmental hospital billing system (the "DRG system") frustrated the Hospital Services Agreement; (2) a modification of this agreement is necessary to provide an equitable remedy for the parties; and (3) the amounts billed for normal newborn babies are to be included in the 1992 and 1993 reconciliations required under the discount clause of this agreement.

With reference to plaintiff's claim for 1992 services, the Court orders defendants to pay plaintiff $39,374.54, which constitutes payment for hospital services and prejudgment interest. With reference to plaintiff's claim for 1993 services, the Court is not satisfied that either party has provided an appropriate method of reconciliation of their respective

positions. Accordingly, the Court refers the case to a Special Master. The Special Master shall assist the parties, through mediation, to arrive at a charging formula that is comparable to the DRG system for the purpose of modifying the discount clause in the parties' agreement. In the event the parties are unable to agree upon a suitable charging mechanism, the Special Master shall receive evidentiary submissions from the parties and shall file a Report and Recommendation as to the appropriate standard for plaintiff's billings. The Court assigns the Special Master to subsequently reconcile the amount, including prejudgment interest, that the defendants owe plaintiff for 1993 hospital services pursuant to this formulated rating system.

## FACTUAL BACKGROUND

Unihealth, a nonprofit public benefit corporation organized under the laws of the state of California, was the sole corporate member of Meadowlands Hospital Medical Center ("Meadowlands"), which operated a health care facility until March 29, 1994, when operations were ceased. Unihealth then sold certain of its asserts to Liberty Riverside Health Care, Inc. According to the terms of the sale agreement, Meadowlands retained the rights to any claims against the defendant, among others. On August 3, 1995, Meadowlands was dissolved and all of its claims, including the one against defendants, were distributed to Unihealth.

On April 1, 1991, Meadowlands entered into a "Hospital Services Agreement", ("the Agreement"), with U.S. Healthcare, Inc. and The Health Maintenance Organization of New Jersey, Inc. ("HMO").[1] This agreement provided for the terms by which U.S. Healthcare would pay Meadowlands for services rendered to its members. *See* Ex. P-1 (the Agreement). Schedule A of the contract describes the services covered under the contract. *See id.* at pp. 1–2 of Schedule A. According to this schedule, "Maternity Care" service includes "semi-private accommodations in a regular maternity bed for the

purpose of delivering a baby; inclusive of daily service and all ancillary services for both mother and child." *Id.* at p. 1 of Schedule A.

The Agreement also provides that "fees to be charged by Hospital for Hospital Services rendered to Members shall be as described in Schedule B, attached hereto and by reference made a part of this Agreement." *Id.* at p. 1. Schedule B provides a table of rates that Meadowlands could charge for various services. *See id.* at Schedule B. U.S. Healthcare agreed to pay "per diem" rates for all inpatient medical procedures aside from vaginal and caesarean (C-section) deliveries, which were to be paid through a flat-fee "case" rate system.[2] *See id.* Schedule B states that case rates for both vaginal deliveries and C-sections "include[ ] normal newborn." *Id.*

Under the "per diem" rate system, defendants were to pay Meadowlands a fixed daily amount when a patient was in the hospital for that particular procedure. *See id.* According to calculations made during the negotiation of the Agreement, these per diem rates resulted in significantly lower hospital billings than the billings accrued from the rates that Meadowlands ordinarily charged other patients. *See* Transcript of February 10, 1998 Proceedings, Volume I ("TI"):50–52. To compensate plaintiff for its potential loss in revenue under such terms, the parties incorporated the following clause, which the Court refers to as "the discount clause," at the bottom of Schedule B:

> If the overall discount for all Inpatients exceeds 40% during a calendar year, U.S. Healthcare will reimburse Meadowlands Hospital and Medical Center monies beyond the 40% discount. A reconciliation will be completed by HMO within 180 days of the end of the calendar year.

*Id.*

Although the discount clause applies where "the overall discount ... exceeds 40%," the

---

**1.** HMO is a subsidiary of U.S. Healthcare and operates a health maintenance organization in New Jersey. The Court refers to the defendants HMO and U.S. Healthcare, Inc., as "U.S. Healthcare," collectively.

**2.** Schedule B also provides a list of fixed rate charges for five types of outpatient services.

term "discount," specifically, the lodestar from which the discount should be assessed, is not referred to or defined anywhere in the Agreement. The correct interpretation of this clause is one of the primary issues in this case. The resolution of this issue determines the amount of payment that the defendants owe under the Agreement for the year of 1993. The second issue is whether amounts billed for normal newborn babies are to be included in the reconciliation required under the discount clause. The resolution of this issue determines the amount of payment the defendants owe for the years of 1992 and 1993.[3]

After the parties executed the Agreement in 1991, they began to perform under it. Plaintiff provided services to U.S. Healthcare members, and submitted bills to U.S. Healthcare for those services. *See* Exs. P–4, and P–5 (Meadowlands Hospital U.S. Healthcare "Patient Account Inquiry Screens" for the Calender Years of 1992, 1993, respectively).[4] U.S. Healthcare, in turn, paid for those services in accordance with the rates contained in Schedule B to the Agreement. *See id.*

Although the Agreement required the defendants to calculate the reimbursement due under the discount clause within 180 days of the end of the calendar year, the parties never agreed upon a reconciliation for any year. *See* Ex. P–1 at Schedule B; Plaintiff's Proposed Conclusions of Law and Findings of Fact ("PF") at p. 19. Furthermore, the defendants never made any payment under the provisions of the discount clause for the years of 1992 and 1993. *See* Stipulation of Facts ("SF") ¶ 10.

In its Complaint, plaintiff claims that U.S. Healthcare owes money pursuant to these provisions. Specifically, it charges the defendants with breach of contract, (Count 1), breach of the implied covenant of good faith and fair dealing (Count 2), and unjust enrichment, (Count 3). Plaintiff seeks payment for services rendered in the amount of $33,088.32 for the year of 1992, and $539,420.40 for the year of 1993. *See* PF at pp. 45–46. In addition, plaintiff seeks prejudgment interest on its award. *See id.* pp. 48–50.

### a. *The Discount Clause.*

#### 1. The DRG System.

The negotiation of the Agreement took place in 1991. Since 1979, a regulatory system existed throughout the State of New Jersey that required hospitals to bill for in-patient services at prices set by the New Jersey Department of Health. *See* N.J.S.A. 26:2H–1 *et seq. See* SF ¶¶ 11–12. This categorization of mandatory charges was based on the "DRG" (the "Diagnostic Related Groups"), which was a classification of all the medical procedures and treatments that could be rendered on an inpatient basis in a hospital. *See id.* In contrast with the per diem terms of the Agreement between the parties, the statewide DRG system provided for flat service rates, or "case rates."[5] A "case rate" is a fixed rate for the entire hospital stay for a patient, regardless of how long that patient stayed in the hospital or the amount of services that were provided.[6] *See* TI:9.

The starting point for calculating DRG case rates was the "base rate." The "base rate" was presumed to represent the direct cost of care for a patient with a particular

---

**3.** Although Unihealth initially sought reimbursement for the years 1991 through 1994 in its Complaint, Unihealth abandoned its claims for 1991 and 1994, and now pursues claims for only 1992 and 1993. *See* Plaintiff's Proposed Conclusions of Law and Findings of Fact at p. 3 n. 2.

**4.** The plaintiff maintained its billing records in its computer system, and generated them in the form of "Patient Account Inquiry Screens." *See* Stipulation of Facts ¶¶ 21, 22; P–3, P–4, P–5. These records contained information regarding patient admissions, discharges, billings, and collections. *See id.*

**5.** Pursuant to N.J.S.A. 26:2H–1 *et seq.* (now repealed), U.S. Healthcare was exempted from the State-mandated DRG rates, and was able to negotiate a lower schedule of discounted payments with hospitals. *See* SF ¶ 13.

**6.** The DRG system required hospitals to generate separate case rate bills for each patient. *See* TI:33–34. Although U.S. Healthcare was exempted from the state mandated DRG rates, *see supra* n. 5, Meadowlands was still required to submit separate bills to defendants for mother's care and babies' care in maternity cases. *See* TI:33–34.

condition corresponding to each of the approximately 500 diagnostic related groups. *See* TI:13–15. The ultimate DRG case rate was determined by adjusting the base rate by several factors.[7] *See* TI:13–22. Because these factors varied, the DRG rates could fluctuate from time to time during the course of a year.[8] TI:12.

Approximately fourteen years after the date of its enactment and two years after the parties entered the Agreement, the New Jersey legislature abolished the DRG rate system, effective January 1, 1993. *See* SF ¶ 14.

### 2. The Charge Master.

Both before and after the abolition of the DRG system, Meadowlands, like all other hospitals, maintained a "Charge Master." *See* TI:40. This several hundred paged document was essentially a "big price list" that itemized the prices for all hospital procedures, supplies, medicines, nursing care and staff physician services at Meadowlands. *See* TI:40, 41. Before the repeal of the DRG system, these prices were "essentially academic," insofar as they appeared on hospital bills but did not factor into the amounts due. TI:42.

After the abolition of the DRG system, however, Meadowlands based its billing rates on the Charge Master prices. *See* TI:39. In contrast with the governmentally regulated, fixed rates under the DRG system, the Charge Master rates were determined by the hospital. *See* TI:44. Consequently, after the abolition of the DRG system, the hospital was free to increase or decrease charges at will, as long as the Charge Master rates were

the same for all payers and did not exceed the State-mandated upper limit of profitability. *See* TI:45.[9]

According to the defendants' calculations, plaintiff's average rates for medical services increased by more than 65 percent from 1992 to 1993 after the deregulation of hospital charges. *See* SF at p. 20. These calculations indicate that the average per patient-day amount billed to U.S. Healthcare by plaintiff in 1991, 1992, and 1993 (excluding normal newborn billings) was $769, $1,049 and $1,609, respectively. *See id.* ¶ 36; D–7, D–8, and D–9.

### 3. 1991 Negotiations.

The sole negotiator of the Agreement on behalf of the defendants was Paul Crespi. *See* SF ¶ 7. Crespi has been employed by U.S. Healthcare since April 14, 1988, and has acted as its director, assistant vice president, and vice president. *See id.* ¶ 5; Transcript of February 11, 1998 Proceedings, Volume II ("TII"):5. Joseph Coyle, who was the Vice President of Finance and Chief Financial Officer of Meadowlands in 1991, represented the plaintiff during negotiations. *See id.* ¶ 8. The testimonies of these individuals at trial were similar; Crespi, who testified after Coyle, virtually adopted Coyle's version of the negotiation proceedings.[10] *See* TII:10, 11.

Crespi testified that U.S. Healthcare's goal in negotiating the Agreement was to contract on a "per diem," as opposed to "case rate," basis. *See* TII:9. According to Crespi, U.S. Healthcare believed that contracting on a per diem basis would result in lower costs, owing

---

**7.** The additional factors were the mark-up factor, the payor factor, and the prompt payment factor. *See* TI:13–22.

**8.** The markup factor could range from a value of 1.1 to 4.0. *See* TI:15, 20–22. The payor factor was adjusted annually but did not vary substantially from year to year. The prompt payment factor did not change. The base rates generally varied from 5 to 10 percent annually. *See id.*

Unihealth's Witness, Joseph Coyle, testified that the DRG rates "tended to drift up throughout the year and then go back down on January 1st." TI:47. Coyle indicated that one of the most dramatic fluctuations in rates occurred in the beginning of 1991, immediately prior to the ne-

gotiations of the Agreement. *See* TI:46–47. In December, 1990, the DRG rate quadrupled and subsequently dropped to approximately the original level in January, 1991. *See id.*

**9.** During the trial, Coyle acknowledged that "the Charge Master itemized billing ... goes up and down depending on what the hospital wants to do," and that "the DRG system [and the Charge Master system] were the two opposite ends of the billing type of spectrum." TI:45.

**10.** Crespi testified that he overheard Coyle's testimony of the negotiations, that he agreed with his description of the parties' positions and what was said, and that he "would have said the same thing almost." TII:10–11.

to defendants' "aggressive case management." *See id.* U.S. Healthcare's additional goal in obtaining a long-term, fixed rate contract with Unihealth was to avoid the fluctuations that took place in the DRG-based rate system. *See id.* Coyle, in turn, testified that Crespi expressly stated that his purpose in negotiating the Agreement was to attain a per diem, multi-year contract at a fixed rate. *See* TI:47. Coyle recognized that U.S. Healthcare aimed to establish an agreement with fixed rates, so that it might offer customers "premiums that could be stable for over a several year period." *See* TI:47–48.

Coyle testified that Meadowland's goal in negotiating the Agreement was to gain patients who were members of U.S. Healthcare. *See* TI:51–52. Prior to the negotiation of this contract, Meadowlands did not have an agreement with the defendants. However, U.S. Healthcare did have a contract with Franciscan Health System, which operated St. Mary's Hospital in Hoboken and is a competitor of Meadowlands. *See* TI:51–52; 19; TII:8. Coyle testified that U.S. Healthcare referred its patients from Meadowlands to St. Mary's because St. Mary's had a contract with U.S. Healthcare and Meadowlands did not. *See* TI:51. Consequently, plaintiff was "anxious to get that business back" by contracting with U.S. Healthcare. *Id.*

Coyle testified that, during the negotiations, he was nevertheless concerned that accepting the per diem/ maternity case rate terms offered by defendants would result in a financial loss for Meadowlands. *See* TI:52. Coyle indicated that, "as patients stayed fewer and fewer days," Meadowlands would get a lower percentage of the payment it would ordinarily have received under the DRG case rate. TI:6–7, 12. He based this opinion, in part, on profit calculations he made during earlier negotiations between the parties in 1989. *See* TI:49, 50. At that time, Coyle analyzed the per diem rates proposed by U.S. Healthcare to calculate whether an agreement would be profitable to Meadowlands. *See id.* Coyle testified that the 1989 calculations revealed that the aggregate pay-

ments of these rates would only total approximately 50 to 60 percent of the payments the hospital would have received for services under the DRG case rate system. *See* TI:50–51. Under these circumstances in 1989, Meadowlands did not enter into a contract with U.S. Healthcare.

In 1991, Coyle made additional profit calculations and the parties resumed negotiations. *See* TI:50. According to Coyle, the 1989 rates were approximately the same as the rates calculated in the 1991 proposal. *See id.* He testified that, although Meadowlands was willing to suffer some loss to contract with defendants and recapture patients referred to St. Mary's, Meadowlands insisted on placing a limitation on the loss it would incur under the proposed per diem/ maternity case rate system. TI:11–12, 51–52. Voicing these concerns, Coyle suggested in 1991 that the Agreement contain the "discount clause" within Schedule B. *See* TI:27–28. During negotiations, he explained to Crespi that his purpose in suggesting the clause was "to limit the financial risk of a multiple year contract at predetermined rates, particularly at per diem and case rates that [he] knew were lower than what [plaintiff was] getting paid already." *Id.* At trial, Crespi acknowledged that he understood Coyle insisted on including a discount clause during the negotiations because "he wanted some protection on his normal revenues." TII:28. U.S. Healthcare, in turn, agreed to this discount clause in exchange for a four year contract. *See* TII:27–28.[11] As a result, U.S. Healthcare drafted the discount clause limiting U.S. Healthcare's overall discount for inpatient services to 40% of the hospital's "normal revenue." TI:30; TII:28.

During negotiations, however, neither Crespi nor Coyle recall expressly defining the amount of the hospital's "normal revenue," from which the discount would be calculated. *See* TI:30; TII:22. Nevertheless, both individuals testified that their understanding was that hospital's "normal revenue" corresponded to the current rates under the DRG system. The following discussion

---

11. Crespi testified: "We [the defendants] gave the rates, [plaintiff] wanted the [discount clause]. We said if we're going to give the [discount clause] and agree to it, we want the 'longtermness.'" TII:28.

during trial addresses Coyle's understanding of the "discount clause" at the time of negotiations:

**Coyle:**

"[The discount clause is a l]imitation on the amount of discount to be provided; discount being the difference between the amount that was billed and the amount that was agreed upon within the contract customarily understood to be the discount, and that we wanted to limit that amount over the life of the contract.

**Court:**

You're using a phrase, "a discount from the amount that was billed" . . . My question to you is: The amount that was billed; by what standard?

**Coyle:**

The only standard we had in place at the time was the DRG rate, that was the amount that [sic] the rate-setting system that we were in.

**Court:**

So you understood that where it says in the [discount] clause, where it says, "If the overall discount for all in-patients exceeds 40 percent during a calendar year"; did you understand that the words "of the DRG billing rate" were to be incorporated or implied to be included in that sentence?

**Coyle:**

Yes, that would have been my understanding, that would have meant that the payment would be at least 60 percent of the DRG billing rate.

T131.[12] Crespi similarly testified that he understood "the discount for all in-patient rates . . . was to apply to the DRG rates . . . the

discount was to apply to nothing other than the DRG rates." TII:12.

During the negotiations, neither Crespi nor Coyle discussed the possibility that the DRG might be abolished, or the effect that this abolition would have upon any of the terms of the Hospital Services Agreement. *See* SF ¶ 15. There is no indication in the Record that any legislative initiatives to abolish the DRG system occurred prior to those which led to its repeal in 1993.[13] Coyle, who was involved with the healthcare industry since 1981 in New Jersey, worked in the context of the DRG system for the duration of his career. *See* TI:38.

Coyle testified that, when he entered the Agreement, he never expected U.S. Healthcare to either pay the Charge Master rate or to reconcile the discount clause with the Charge Master rate. *See* TI:61. To the contrary, he stated that the parties "discussed the DRG system as the context in which [they were] negotiating the contract." TI:26. During the negotiations, Crespi neither reviewed nor discussed the Charge Master with Coyle or any other representative of the hospital. *See* TII:14. Crespi testified that he would not have entered into the contract if the discount provision applied to the difference between the contract rates and the hospital's itemized Charge Master rates. *See* TII:14. Coyle, in turn, was uncertain as to whether he would have entered into the Agreement if the contract specifically stated that the discount clause would no longer remain valid if the DRG system were abolished. *See* TI:29.

#### 4. The Abolition of the DRG System.

The New Jersey legislature abolished the DRG rate system effective January 1, 1993.

---

12. The following testimony further addresses Coyle's understanding of his and Crespi's understanding of the discount clause:

**Attorney:** Was there a discussion at the at time between you and Mr. Crespi in which you discussed with him that the discount was for the DRG amount billed?

**Coyle:** I don't recall the terminology we were using. We were talking about in-patients, and in-patients were billed DRG rates. So whether we used the term "DRG rate" or "amount due" or "amount billed," I don't know.

**Attorney:** Would it be correct to say that you were operating in that time in a DRG universe?

**Coyle:** Yes.

**Attorney:** And there was no other system for billing inpatients?

**Coyle:** That's correct.

**Attorney:** That was the premise of billing for hospital inpatients at that time?

**Coyle:** Yes.
TI:32.

13. Problems with the DRG system were foretold in *United Wire, Metal & Machine Health and Welfare Fund, et al. v. Morristown Memorial Hospital, et al.*, 793 F.Supp. 524 (D.N.J.1992), *aff'd in part, rev'd in part*, 995 F.2d 1179 (1993).

*See* SF ¶ 14. Whereas under the DRG system, a single charge covered all services, after the repeal of the statute, hospital billing became "unbundled" and hospitals charged for each separate service or material used. *See* Defendant's Contested Facts ("DF") ¶ 9. In 1993, Meadowlands began charging all of its patients in accordance with the itemized prices listed in its Charge Master.

In this lawsuit, plaintiff claims that, in absence of the DRG system, the hospital's "normal revenue" should correspond with the Charge Master rates for the purpose of applying the discount clause. Specifically, plaintiff asserts that U.S. Healthcare is required to pay plaintiff at least 60 percent of the total amount due under the Charge Master billing schedule for services provided to U.S. Healthcare members since January 1, 1993.

The Defendants counter that the existence of the DRG regime was an implied condition to the discount clause of the Agreement. They therefore assert that, although the Agreement and the Schedule B rates remained valid after the repeal of the DRG, the repeal discharged defendants of any duty to perform under the discount clause by reimbursing plaintiff for excess discounts. In sum, the defendants claim that they do not owe Unihealth any payment for medical services rendered in 1993, since they paid plaintiff for these services pursuant to the per diem/ maternity case rates listed in Schedule B.

In response, plaintiff asserts that, even if the Court found that the DRG was an implied condition to the Agreement, in the absence of this condition, the parties should be discharged from the duty of performing the entire contract, including the duty of charging the defendants the per diem/ maternity case rates listed in Schedule B. In this instance, plaintiff seeks the quantum meruit, or reasonable value of its 1992–1993 services. Although the plaintiff advocates this quan-

tum meruit theory, it fails to provide the Court with any information, apart from its unilaterally-set Charge Master rates, from which to assess the reasonable value of hospital services.

**b. *The Maternity Case Billing.***

The parties also dispute whether the amounts billed for normal newborn babies were to be included in the 1992 and 1993 reconciliation required under the discount clause of the Agreement.[14] As discussed, the parties began performing under the Agreement in 1991. Plaintiff provided services and submitted bills to defendants, and defendants paid these bills in accordance with the Schedule B rates. Although the parties never agreed upon a reconciliation pursuant to the discount clause for any year, the defendants calculated a reconciliation for the year of 1992. *See* Ex. P–2 (May 11, 1993 Correspondence from Crespi to plaintiff).[15] During the trial, the vice president for medical cost analysis at U.S Healthcare in May, 1993, James P. Bilodeau, explained the procedure for calculating reimbursements:

> [The reimbursement under the discount clause] was calculated by taking the total billed amount for the inpatient services, multiplying that by a factor of 60 percent, and deducting the amount of payment for those inpatient services, and it is the difference of payments to the 60 percent number.

TII:44–45. The "total billed amount" in the defendants, reconciliation for the year 1992 included the amounts billed for well newborn babies. *See* Ex. P–2; TII:30, 45–46.

Since the defendants performed this reconciliation, they have recanted their view that the amounts billed for the care of normal newborns were to be included in the 1992 and 1993 reconciliations under the discount clause. Presently, the defendants argue that the charges for newborns should be excluded

---

14. The defendants argue that the bills for normal newborns should not be reconciled with the discount clause for the year of 1992, and that the discount clause became void in the year of 1993. In the alternative, defendants argue that if the Court finds that the discount clause remained valid throughout 1993, the bills for normal new-

borns should not be reconciled with this clause for the years of either 1992 or 1993.

15. Defense witness, James P. Bilodeau, testified that he supervised the preparation of this correspondence. *See* TII:36–37, 44–45.

from the reconciliations because "well baby's care was expressly included in the case rate in the contract for the mother's maternity care ..." DF ¶ 69. The defendants argue that this "double billing" is contrary to the language in the Agreement, and that it resulted in an artificial inflation of the "amount billed" for each year, which in turn distorted the calculation of the 60 percent figure.

Plaintiff interprets the same contractual language to mean that charges for newborn babies are to be "included" in the calculations to determine the "normal revenues" that plaintiff would have received absent the Agreement. PF at p. 40. Both parties point to the following contractual language to support their contentions:

> "Maternity care" includes semi-private accommodations in a regular maternity bed for the purpose of delivering a baby; inclusive of daily service and all ancillary services for *both mother and child.*

Ex. P–1 at p. 1 of Schedule A (emphasis supplied). They furthermore point to Schedule B, which states that case rates for vaginal deliveries and C-sections *"include* [ ] normal newborn[s] *."* Ex. P–1 at Schedule B (emphasis supplied).

Mr. Donald Shinnick, the Vice President of Patient Administrative Services at Unihealth from 1990 to 1996, testified that, according to plaintiff's theory, the defendants owe plaintiff $33,088.32 in reimbursements for the year of 1992, and $539,420.40 for the year of 1993. *See* TI:90–95; PF pp. 45–47. He arrived at these calculations by including the amount normally charged for services to newborns in his reconciliations under the discount clause. *See id.* While Shinnick based the "normal revenue" in his 1992 reconciliations on the DRG rates, he based his 1993 reconciliations on the hospital's Charge Master Rates. *See id.*

Specifically, Shinnick calculated the reimbursement of lost revenue by multiplying the total amount billed for inpatient services (including normal newborns) by a factor of 60 percent, and then deducting the total amount that the defendants paid pursuant to the Schedule B rates. *See id.* Using this formula, Shinnick calculated that the total amount owed for 1992 services under the discount clause was $33,088.32. *See id.* Although the defendants argue that the reconciliations should not include billings for newborns, they concede that "[i]f ... claims for normal newborns are included in the total amount billed for inpatient services in 1992 ... U.S. Healthcare paid Meadowlands $33,088.32 less than 60% of such total amount billed." DF ¶ 72.

Shinnick next calculated that, in 1993, the total amount billed under the Charge Master system for maternity cases (including charges for normal newborns) was $1,763,-468.95. *See id.* From 60 percent of this figure, ($1,058,081.37), Shinnick subtracted the amount the defendants paid plaintiff in 1993, ($518,660.97). *See id.* He arrived at the amount of $539,420.40. Consequently, plaintiff seeks the sum of these two figures, $572,508.72, in addition to prejudgment interest, for the hospital services rendered to U.S. Healthcare members during the years of 1992 and 1993. *See id.*

## DISCUSSION

Federal Jurisdiction exists pursuant to 28 U.S.C. ¶ 1332(a)(1), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.[16] Consequently, the Court must look to the law of the state in which it sits to provide the rules of substantive law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *City of Philadelphia v. Lead Industries Ass'n.,* 994 F.2d 112, 123 (3rd Cir.1993).

### A. Contract Interpretation.

The Court is called to interpret the meaning of the contractual term "discount" as it applies to U.S. Healthcare's duty to reimburse plaintiff for service discounts in excess of 40 percent of the hospital's normal revenue. Specifically, the Court must determine the basis from which the parties intended the discount to be assessed.

16. The parties have consented to the jurisdiction of the undersigned Magistrate Judge for all purposes, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c).

The standard of interpretation of a contract is the meaning that would be ascribed to it by a reasonably intelligent person who was acquainted with all the usages and circumstances surrounding the making of the writing. *See Deerhurst Estates v. Meadow Homes, Inc.*, 64 N.J.Super. 134, 165 A.2d 543 (App.Div.1960). As an aid in ascertaining this meaning, a court should consider "the relations of the parties at the time of the agreement, the attendant circumstances and the objects they were trying to attain." [17] *Tessmar v. Grosner*, 23 N.J. 193, 201, 128 A.2d 467 (1957). For example, the negotiating history of the parties, *Deerhurst Estates*, 64 N.J.Super. at 149, 165 A.2d 543, as well as existing statutes and rules of law, are among the surrounding circumstances to be considered in the exercise of the interpretive process. Arthur Linton Corbin, 3 *Corbin on Contracts* § 631 § 551, 803, (1962), *cited in Greggio v. City of Orange*, 69 N.J.Super. 453, 464, 174 A.2d 390 (Law Div.1961). *See also Fidelity Union Trust Company v. Robert*, 36 N.J. 561, 566, 178 A.2d 185 (1962) ("[New Jersey] courts will broadly search for the probable common intent of the parties, will consider their relations, the attendant circumstances and the objectives they were trying to obtain, and will endeavor to find a reasonable meaning in keeping with the express general purpose") (citing *Tessmar v. Grosner*, 23 N.J. at 201, 128 A.2d 467); *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301, 96 A.2d 652 (1953) ("the polestar of construction is the intention of the parties as revealed by the language used"); *Smith v. Peninsula House, Inc.*, 65 N.J.Super. 341, 346, 167 A.2d 807 (App.Div.1961) (the meaning of the contractual term "net profit" cannot be determined in a vacuum; its meaning can be garnered in the context in which it is used and according to the parties intent).

Courts look to the intent and circumstances surrounding contracts to glean the existence of implied conditions, in addition to the meaning of contractual terms. In his discussion of implied conditions, Corbin notes:

> [C]ontractors can "express" their intentions otherwise than by the use of specific words. Just as parties can make promises without using words to do so, they can also express an intention that a fact or event shall be a condition of legal duty without putting it into words.

3A *Corbin on Contracts* § 631. *See, e.g., Borbely v. Nationwide Mutual Ins. Co.*, 547 F.Supp. 959, 972 (D.N.J.1981) (noting that when parties have reached an agreement "but have had no communication regarding a matter as to which their legal rights must be determined, the missing element may be supplied ... by proof of an implied-in-fact understanding between them," and finding that a New Jersey employee's termination does not constitute breach of contract where the employer relocated to another state prior to termination, and the employer's presence in New Jersey was an implied condition to the contract); *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965) ("terms may be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to specifically express them because of sheer inadvertence or because the term was too obvious to need expression"); *Porcelli v. Titus*, 108 N.J.Super. 301, 313, 261 A.2d 364 (App.Div.1969), (citations omitted) (a contract is considered "subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties"); *Edwards v. Leopoldi*, 20 N.J.Super. 43, 54, 89 A.2d 264 (App.Div.1952) (implied conditions are created "by way of

---

17. The "parol evidence rule" does not apply to bar the examination of such extrinsic circumstances in this case, since the Court does not aim to vary or contradict the meaning of the term "discount" in the contract. The meaning of this term cannot be contradicted or varied because it is undefined in the Agreement. The Court's goal, therefore, is to interpret the term "discount" by

discerning the parties' initial understanding of it. *See Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 302, 96 A.2d 652 (1953). *See also* 3 *Corbin on Contracts*, § 579 (the parole evidence rule "does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to [contractual] terms").

implication of the terms, or nature, or the contractual engagement in association with the surrounding facts").

In light of the parties' mutual understandings and goals, and for the reasons herein, the Court makes the following findings of fact:

- The parties intended to base the discount assessment on the rates of the DRG system.
- The existence of this system was an underlying assumption, or implied condition, of the contract.

According to the testimony, neither Crespi nor Coyle dispute the fact that they negotiated the contract in the context of this statewide system, which had been in place for over a decade in New Jersey. Both similarly admit that their understanding of the hospital's "normal revenue" from which the discount would be assessed corresponded to the current DRG rates. Furthermore, neither party contemplated the abolition of the DRG regime, nor the application of another standard from which to assess the discount.

The undisputed testimony further indicates that, during both the 1989 and 1991 negotiations, the parties discussed the feasibility of an agreement under the rubric of the DRG rates. After calculating the projected profits under the DRG regime in 1991, the parties were finally able to agree upon a compromise. This compromise addressed their respective goals because it provided for per diem rates with a limiting discount provision that was based on the DRG rates.

In light of these circumstances, the Court finds that the parties intended the DRG rates to serve as a polestar for the calculation of the discount. The Court further finds that the existence of the DRG was an underlying assumption, or implied condition of the Agreement, notwithstanding the absence of express contractual language in this regard. Specifically, the Court finds that the functioning of the parties' Agreement was dependant upon the existence of the DRG rates, and that the abolition of said rates rendered

the parties unable to adhere to the terms of their original compromise.

## B. Frustration of the Agreement.

■ Having determined that the discount clause related to the DRG system, and that, as such, the existence of this system was an implied condition to the Agreement, the Court must consider whether the non-occurrence of this condition was grave enough to frustrate the entire contract.[18]

■ The underlying principles of the frustration doctrine are similar to the principles of implied condition. *See Porcelli v. Titus,* 108 N.J.Super. 301, 313, 261 A.2d 364 (App. Div.1969); *A Leet Leasing Corp. v. Kingshead Corp.,* 150 N.J.Super. 384, 397, 375 A.2d 1208 (App.Div.1977). New Jersey courts look to the Restatement (Second) of Contracts when applying this contractual defense. *See General Electric Capital Corp. v. Charleston,* 1989 WL 63213 *2 (E.D.Pa.1989); *Seitz v. Mark–O–Lite Sign Contractors, Inc.,* 210 N.J.Super. 646, 651–52, 510 A.2d 319 (1986). Section 265 of the Restatement provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981).

■ The accompanying comments to Section 265 elaborate upon the three requirements that are necessary to invoke the frustration defense. Firstly, the frustrated purpose must have been a principal purpose of that party in making the contract. *See Restatement (Second) of Contracts* § 265 cmt. a. The purpose must be "so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Id.*

---

**18.** The concept of frustration was not addressed by either party during arguments at trial or in the post trial briefs.

Secondly, the frustration must be substantial; "[it] must be so severe that it is not fairly to be regarded as within the risks that [the parties] assumed under the contract." *Id.* In his discussion of this requirement, Professor Corbin notes that "[r]elief from duty ... can safely be granted on the ground of frustration of purpose by the rise or fall of values, only when the variation in value is very great and is caused by a supervening event that was not in fact contemplated by the parties and the risk of which was not allocated by them." 6 *Corbin on Contracts* § 1355.

Finally, the commentary reiterates that the doctrine may not be invoked where the parties assumed the risk of the occurrence of the frustrating event. *See* Restatement (Second) of Contracts § 265 cmt. a ("the non-occurrence of the frustrating event must have been a basic assumption of the contracting parties"). *See also Edwards,* 20 N.J.Super. at 53, 89 A.2d 264 (citations omitted) (courts will not relieve against "hardship arising from bad judgment ... or from a change in circumstances ... where these should have been in the contemplation of the parties as possible contingencies when they entered into the contract").

A New Jersey district court analyzed the frustration doctrine, among other contractual defenses, in *Union County Utilities v. Bergen County Utilities Authority,* 995 F.Supp. 506 (D.N.J.1998). The court held that a series of waste disposal contracts between the parties became unenforceable as a result of a subsequent Third Circuit decision, *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 F.3d 652 (3rd Cir.1997).[19] *See id.* It recognized, however, that imposing an absolute rule of invalidity would visit a great disadvantage to the plaintiff while providing the defendant with a windfall. *See id.* at 517–18. In the alternative, the court observed that the contract might have been frustrated, and remanded the case to state court so that it might examine this issue and

fashion a more equitable remedy. *See id.* at 520.

Specifically, the court instructed the state court to determine whether the parties allocated the risk of the statute's repeal. *See id.* at 517–18. As a general matter, it found that "both contracting parties are equally innocent victims of a state-imposed regulatory regime." *Id.* at 516. It observed that, "[a]lthough parties who contract in highly regulated environments are on notice that the law may change against their interest, it does not necessarily follow that the entire burden of that change should be visited upon any one party absent contractual provisions specifically allocating the risk of a change in law." *Id.* at 517. Finally, the Court noted that an equitable remedy would be appropriate only if the frustrated purpose was so central to the contract that it could not be severed from the whole. *See id.* It advised the state court to determine whether a contractual defense applied by examining both the language of the contract and evidence of the parties' intentions and goals. *See id.* at 517–18.

Applying these criteria, the Court finds that the supervening legislative dismantling of the DRG regime satisfies the three requirements of Section 265. Although the repeal did not prevent Meadowlands from providing hospital services to U.S. Healthcare members, it prevented the parties from calculating a rate of payment pursuant to the Agreement. As noted, U.S. Healthcare argues that the repeal's sole effect on the contract was to invalidate the discount clause, while Unihealth argues that the discount clause should remain effective and should apply to the hospital's unilaterally assigned Charge Master rates. The Court adopts neither theory, since each would substantially frustrate the principal purpose of the Agreement to the unfair advantage of one party which assumed no greater or lesser risk than the other. For the reasons herein, the Court makes the following findings of fact:

- The parties, principal purpose for entering the Agreement was to arrive at a

---

**19.** *Atlantic Coast Demolition & Recycling, Inc.,* held that New Jersey's flow control statutes gov-

erning the disposal of in-state solid waste were unconstitutional. 112 F.3d 652.

mutually satisfactory, long term pricing compromise which limited both parties' exposure to risk.

- The abolition of the DRG regime substantially frustrated this purpose and the goals of the parties.

- Neither party assumed the risk of the repeal of the DRG regime.

Firstly, the Court finds that the parties' ability to use the DRG rates as a lodestar to reconcile bills and excess discount amounts was essential to the parties' pricing compromise. The Court further finds that the parties' principal purpose for entering the Agreement was to arrive at this compromise. Pursuant to *Union County Utilities*, the Court bases this determination on the parties' intentions and contractual language. The testimony of each negotiator indicates that the parties were primarily motivated to contract to attain a steady, long-term business relationship involving minimal risk. The defendant hoped to gain a long term relationship while avoiding rate fluctuations, and the plaintiff sought to gain business while limiting its total amount of lost profit. To accomplish these goals, plaintiff agreed to charge defendants at a less profitable rate in exchange for the reimbursement of discounts exceeding the DRG rates. Consequently, the Agreement depended upon the existence of both terms, which were contingent upon one another and equally essential to the compromise.[20] The parties, reluctance to enter into the 1989 Agreement which lacked these provisions demonstrates that a contract not containing such counterbalancing elements "would [have] ma[d]e little sense." Because both parties' principal purpose was to enjoy a low risk, long-term pricing formula, and because the demise of the DRG system foiled that goal, the Court finds that the first requirement of Section 265 is satisfied.

Secondly, the Court finds that the circumstances in this case clearly meet the strict standard of substantial disappointment under Section 265. As discussed, the parties hold differing views regarding the repeal's effect on the contract. To adopt either view would substantially frustrate the expectations of the other party. According to plaintiff's theory, U.S. Healthcare owes plaintiff 60 percent of the billing rates which were unilaterally determined by the Meadowlands in 1993. Again, the defendants calculate that these Charge Master rates increased by more than 65 percent, from $1,049 to $1,609 per patient-day, within one year after the deregulation of hospital charges.[21] In contrast, the defendants claim that, after the repeal, the plaintiff no longer enjoyed any protection under Schedule B, while the defendants became entitled to discounts without limit. While the monetary difference at stake in these two interpretations is formidable, the Court notes that the abolition of the DRG system exposed the parties to more than mere financial loss. It prevented the parties from enjoying the security of the low risk, long-term pricing system for which they had bargained. Because the adoption of either theory would visit substantial hardship upon the other party, the second requirement is satisfied.

The Court finds, thirdly, that neither party should be subject to the harsh results proposed by the other party, since neither assumed the risk of the repeal. Both negotiators testified that they never contemplated the abolition of the DRG system. Furthermore, this system was in effect for over ten years at the time of its abolition, and there is no indication in the Record that it was in danger of being annulled at the time the parties entered the Agreement.

Based on the history of the DRG system, the parties should have assumed that the rates would fluctuate, particularly toward the

---

**20.** The defendants argue that, while the DRG repeal voided the discount clause, it did not effect the validity of the remaining provisions of the Agreement. *See* DF ¶¶ 4–7. As discussed, however, the discount clause was central to the parties' pricing compromise, and the creation of this compromise was, in turn, the contracting parties' principal purpose for entering the Agreement. Applying the standard set forth in *Union County Utilities*, the Court shall not consider the

discount clause's validity apart from the remainder of the contract, as urged by the defendants. To the contrary, the Court finds that the discount clause is not severable from the rest of the Agreement, and considers the application of Section 265 in the context of the contract as a whole.

**21.** These calculations do not include billings for normal newborns.

end of each year. However, there was no reason for Unihealth to anticipate that the DRG system would end, and that it would have to continue providing U.S. Healthcare lower per diem rates without the benefit of the discount clause. Nor was there any reason for U.S. Healthcare to anticipate that the system would end, and that it would become subject to plaintiff's unilaterally fixed, flat case rates. The Court realizes, that, as in *Union County Utilities,* these parties were "equally innocent victims of a state-imposed regulatory regime." Consequently, it finds that, in the absence any contractual language of risk allocation, the entire burden of the repeal should not fall upon either party.

For the foregoing reasons, the Court finds that the repeal of the DRG system frustrated the principal purpose of Agreement by depriving the parties of the security of their compromise, that this frustration visited substantial loss upon the parties, and that the parties did not assume the risk of this loss. Consequently, the Agreement between Unihealth and U.S. Healthcare was frustrated, pursuant to Section 265.

### C. Fashioning a Remedy.

According to Section 265, where a supervening frustration of purpose occurs, contracts are void and the parties are discharged from their duties. *See* Restatement (Second) of Contracts § 265. *See also Union County Utilities,* 995 F.Supp. 506, at 516–17; *Edwards,* 20 N.J.Super. at 54, 89 A.2d 264. In this case, although the Agreement between Unihealth and Meadowlands was frustrated, Unihealth has already performed its contractual duties by rendering hospital services in 1992 and 1993. The Court is therefore left with the task of framing an equitable remedy for the parties. Specifically, it must determine the reasonable value of Unihealth's hospital services in the absence of a viable pricing term.

■ Section 272 of the Restatement (Second) of Contracts provides that parties to a frustrated contract may claim relief in the form of restitution "to the extent that [their] performance [under the contract] has benefitted the other." Restatement (Second) of Contracts § 272(1) and cmt. b. Furthermore, the commentary notes advise courts "[t]o avoid injustice ... when the parties have not agreed with respect to a term that is essential to a determination of their rights and duties, [by] supply[ing] a term that is reasonable in the circumstances." *Id.* cmt. c. It refers courts to Section 204 for guidance in supplying the missing contractual terms. *See id.*

Section 204 relates to cases where parties to an agreement "fail to foresee the situation which later arises and gives rise to a dispute ... [and] have no expectations with respect to that situation." Restatement (Second) of Contracts § 204 cmt. b. According to the commentary, courts may supply missing contract terms through interpretation, if "there is tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and the circumstances." *Id.* Comment d. expounds:

> The process of supplying an omitted term has sometimes been disguised as a literal or a purposive reading of contract language directed to a situation other than the situation that arises. Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances.

*Id.* cmt. d.

■ There is no doubt that courts have the power to adjust or "reform" contracts by supplying missing terms that adhere to the parties' original purpose and intent. *See* Restatement (Second) of Contracts §§ 204, 272; III Palmer, Law of Restitution § 13.9 (1978) (courts may reform contracts by awarding parties restitution for partial performance under a voidable contract; this judgment is aimed at "leaving in tact an exchange that ... is in substance the one the parties had in mind ... so as to prevent unjust

enrichment").[22]

Courts have recognized this authority in various situations, including cases where contracts were deemed void due to frustration, impracticability, or mistake. For example, in *Aluminum Co. of America v. Essex Group,* 499 F.Supp. 53 (W.D.Pa.1980), the court held that the appropriate remedy in a case involving a frustrated contract was to modify the contractual price term and grant specific performance. The seller was held entitled to an adjustment by the court of the price term of a 21–year contract under which the seller promised to convert quantities of aluminum supplied by the buyer into molten aluminum for the buyer. *See id.* The court found that the long-term contract was frustrated, impracticable, and the result of a mistake. *See id.* It reached this conclusion after observing that, six years after the execution of the contract, OPEC's actions and unanticipated pollution control costs caused the price of oil and the seller's production costs to rise greatly and unforeseeably beyond the indexed increase in the contract price. *See id.* The court remarked that, if the agreement remained unmodified, the seller alone would suffer a substantial amount of out of pocket loss during the remaining contractual term, even though neither party anticipated or assumed the risk of the supervening events.[23] *See id.* at 63, 79. To avoid this inequitable result, the court fashioned a pricing term that was "suitable to the expectations and to the original agreement of the parties," and

ordered that the parties continue performance under the adjusted term. *Id.* at 80.

In rendering this decision, the court recognized the dangers of judicial modification, but reasoned that it was appropriate where the parties did not assume the risk, and the modification conformed to the parties, original expectations. *See id.* at 79–80. To this end, the court adjusted the pricing formula to yield the buyer "the benefit of its favorable bargain, and [to] reduce [the seller's] disappointment to the limit of risk the parties expected in making the contract." *Id. See also Freidco of Wilmington, Delaware, Ltd. v. Farmers Bank of State of Delaware,* 529 F.Supp. 822, 830 n. 9 (D.Del.1981) (applying Section 272 and reasoning that, "had commercial impracticability [of the utility contract] been shown, the 'reformation' remedy ... would be a relief alternative open to the Court"); *National Presto Industries, Inc. v. United States,* 167 Ct.Cl. 749, 338 F.2d 99 (Cl.Ct.1964) (where parties entered into a contract for the production of shells by use of a new process, where both parties mistakenly believed that certain additional equipment would not be necessary under this new process, and where neither party assumed the risk for these costs, contract should be reformed to make both parties bear the additional costs incurred); *Union County Utilities,* 995 F.Supp. at 516, 518–19 (a court may fashion a remedy to equitably allocate contractual liability by determining whether certain contractual provisions remained enforce-

**22.** Other commentators concur that judicial modification of contracts may be appropriate to create remedies corresponding to the parties, original intent. *See, e.g.,* 17A Am.Jur.2d Contracts § 530 (1991) (a court may adjust the terms of a contract to avoid injustice where a party's performance is excused owing to "the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made"); Robert A. Hillman, *Court Adjustment of Long–Term Contracts: An Analysis Under Modern Contract Law,* 1987 Duke L.J. 1, 20–21 (1987) ("[t]he Goal of court adjustment [of long term contracts] is to preserve the parties' purposes and to avoid unbargained-for gains by one party or losses by the other"); Robert A. Hillman, *An Analysis of the Cessation of Contractual Relations,* 68 Cornell L.Rev. 617, 619 (1983) (to ensure that "each party ... benefit[s] from [a discharged] agreement roughly according to the contract allocation ... [courts] consider expect-

ed benefits, as well as prospective harm ... even when the parties' rights are uncertain because of ... a gap in the agreement"); Richard E. Speidel, *Restatement Second: Omitted Terms and Contract Method,* 67 Cornell L.Rev. 785, 802 (1982) (where contracts are discharged, Section 204 "provides the basis for supplying a reasonable term to achieve justice in the fashioning of appropriate remedies").

**23.** The court noted that the parties took pains to avoid the risk of future economic changes when they crafted the contract. *See Aluminum Co.,* 499 F.Supp. at 63. The contract contained a "business risk limiting device-price indexing with more than customary sophistication and care. [The parties] chose not a single index formula but a complex one with three separate indices." *Id.*

able, notwithstanding the occurrence of a supervening event which voided the series of contracts as a whole).

Courts have modified and enforced contracts in a number of analogous situations to protect the fair expectation of parties. For example, courts have invoked Section 2–305 of the Uniform Commercial Code to adjust pricing terms in sales contracts and require specific performance.[24] In *North Central Airlines v. Continental Oil Co.*, 574 F.2d 582 (D.C.Cir.1978), the court modified a jet fuel supply contract to be consistent with the parties' goals. This contract originally contained a price-adjustment feature tied to the changing 'posted price' of the crude oil from which the jet fuel is refined. *See id.* at 584. Subsequent to the contract's execution, the Federal Cost of Living Counsel set two-tier oil prices based on an "old oil" and "new oil" concept. *See id.* at 585.

The Court of Appeals held that the contract's price escalator clause failed because of the subsequent action by the government. Although it upheld the contract, the panel found that the agreement now had an open price term under UCC Section 2–305(1)(c), and remanded the case for the determination of a "reasonable price" provision. *See id.* 592–93. The court advised the district court to base this price on the parties' intention "to establish an escalation clause which would pass through some of the costs of the raw material by increasing the price of the refined product in a definite relationship to any increase in the posted price of certain crude oil." *Id.* at 593. It consequently suggested that the district court set the price of jet fuel based on the composition of old and new oil and the posted price for each. *See id. See also MGPC, Inc. v. Canadian Hidrogas Resources, Ltd.*, 725 F.2d 1376, 1377, 1379 (Em.App.1983) (remanding a case where a contract containing a pricing provision called for prices "consistent with the [federal] pricing guidelines," so that the trial court might either: (1) ascertain the price by interpreting these regulations; or (2) find that the regula-

tions are too ambiguous to supply a price and determine a reasonably fair price under Section 203–5 of the UCC).

Courts have similarly granted specific performance of covenants not to compete, leases, and other agreements, after supplying contractual terms suited to the parties' initial expectations. *See e.g., Gerard v. Almouli*, 746 F.2d 936, 939–40 (2nd Cir.1984) (recognizing the court's right to modify the parties' obligations under a restrictive covenant, in light of current developments and the parties' initial expectations); *McLouth Steel Corp. v. Jewell Coal & Coke Co.*, 570 F.2d 594, 608–09 (6th Cir.) (enforcing requirements contract and supplying term stating maximum amount to be demanded), *cert dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978); *Phillips Petroleum Co. v. Buster*, 241 F.2d 178, 183 (10th Cir.) (enforcing agreement to provide 'reasonable' quantity of gas at 'reasonable' price), *cert denied*, 355 U.S. 816, 78 S.Ct. 18, 2 L.Ed.2d 33 (1957); *Shoemaker v. American Sec. & Trust Co.*, 163 F.2d 585, 588 (D.C.Cir.1947) (analyzing intent of testatrix when explicit terms of will became impracticable); *Westec Security Services, Inc. v. Westinghouse Electric Corp.*, 538 F.Supp. 108 (E.D.Pa.1982) (reducing the duration of covenant not to compete to 10 years, which was deemed a reasonable period for protection of plaintiff); *Mitchell–Huntley Cotton Co. v. Waldrep*, 377 F.Supp. 1215, 1219 (N.D.Ala.1974) (examining industry practice and trade usage to supply term stating the contractual time period for ginning cotton).

In the instant case, the Court need not grant specific performance, because the hospital already rendered medical services to U.S. Healthcare members during the years of 1992–93. Nevertheless, the Court reserves its right to fashion an equitable remedy by modifying the pricing term of the Agreement to conform with the parties' initial compromise.

---

**24.** Section 2–305 of the Uniform Commercial Code provides, in relevant part, that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time of delivery if ... the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded."

While the Court acknowledges that the remedy of judicial modification should not be undertaken lightly, it further recognizes that the circumstances of this case fall snugly within the ambit of Sections 204 and 272 of the Restatement. Plaintiff deserves restitution to the extent that Meadowlands' hospital services benefitted U.S. Healthcare. Owing to the supervening, unforeseen repeal of the DRG, however, the parties disagree with respect to the application of the discount term, which is essential to a determination of their rights. To avoid injustice, therefore, the Court's task is to supply a missing term that is reasonable under the circumstances. Pursuant to Section 204, the Court may supply through the deduction of "agreed terms and the circumstances." It may further consider "the term the parties would have agreed to" if the possibility of the repeal had been brought to their attention.

The Court has already interpreted the Agreement,[25] and has made fact findings regarding the contracting parties' intentions. Again, the parties' aims were to enjoy the security of a steady, long-term business relationship, and to partake in a low risk billing schedule with a limited discount provision. With regard to terms the parties "would have agreed to" if they anticipated the possibility of the DRG repeal, Crespi testified that he would not have entered the Agreement if the discount clause applied to the Charge Master rates. Although Coyle was uncertain as to whether he would have entered into the Agreement if the DRG system were abolished, it is clear that both parties expected to reconcile the discount provision within the context of this complex governmental billing scheme.

Consequently, any price modification should correspond to the components and patterns of these former rates. In other words, the adjusted pricing formula should reflect the former pattern of DRG rates to bear out the expectations of the parties in the first instance. There is limited information in the record concerning this aspect, and the parties fail to suggest any viable means by which the Court might arrive at this formulation. Therefore, the task of supplying a scheme that is comparable to the former DRG scheme and thereby determining the "reasonable value" of plaintiff's services requires additional information and reconsideration.

### D. Methodology.

The Court recognizes that it enjoys a considerable arsenal of resources to assist it in arriving at this formula. The Court may, for example, enlist the aid of a special master to fashion relief. Federal Rule of Civil Procedure 53 authorizes the appointment of a special master in actions for, *inter alia*, "matters of account and difficult computation of damages."[26] Fed.R.Civ.P. 53(b); *see also* Judith Resnik, *Managerial Judges*, 96 Harv.L.Rev. 374, 448 (1962) ("[s]pecial masters may ... develop remedies in complex cases.").

In addition, the Court may call upon the parties to engage in mediation or other dispute resolution techniques. *See* FedR.Civ.P. 16(c) (courts may require a party or its representative to be present or available by telephone to consider possible settlement of dispute). Both the Restatement (Second) of Contracts and various commentaries reflect the importance of the parties' cooperation in this regard. *See* Restatement (Second) of Contracts § 205 cmt. a. (imposing the duty of good faith and fair dealing upon contractual parties, and encouraging the parties to remain "faithful[ ] to [their] agreed common purpose and consisten[t] with the justified expectations of the other party"); Robert A.

---

**25.** *See* discussion of the frustration doctrine *supra* at pp. 24–31.

**26.** According to Rule 53, an order of reference to a special master should define with specificity the scope of the reference, the issues to be investigated, the time when the report is to be delivered, and the special master's powers. *See* Fed.R.Civ.P. 53(c). The order should also describe the manner by which the special master shall be compensated. *See* Fed.R.Civ.P. 53(a). Depend-

ing upon the terms of the order, a special master may require production of tangible evidence, call parties to testify, and make fact findings based upon the evidence presented at an adversarial hearing. *See* Fed.R.Civ.P. 53(c). The special master must, in turn, submit a report to the court that contains these factual findings and conclusions of law. *See* Fed.R.Civ.P. 53(e)(1). The court may then accept these findings unless "clearly erroneous." *See* Fed.R.Civ.P. 53(e)(2).

Hillman, *An Analysis of the Cessation of Contractual Relations*, 68 Cornell L.Rev. 617, 641–42 (1983) (long term contracts often contain gaps that require the parties to rely upon each other to compromise, and to view one other's interests as "coinciding with the interests of its contracting counterpart"); Robert A. Hillman, *Court Adjustment of Long–Term Contracts: An Analysis Under Modern Contract Law*, 1987 Duke L.J. 1, 20–21 (1987) (before modifying a contract, the court may order parties to engage in good faith bargaining to reach a reasonable agreement). Again, Fed.R.Civ.P. 53 permits a court to assign a special master to assist in settlement proceedings between the parties. *See* Fed.R.Civ.P. 53; Manual For Complex Litigation § 23.13 (3rd ed.1995) ("[j]udges have ... used special masters to assist in settlement of complex litigation").

Finally, the Court may turn to the parties and their lawyers for help in crystalizing potential remedies. The court employed this technique to modify a covenant not to compete in *Westec Security Services, Inc.*, 538 F.Supp. 108. The court required the parties to assist it in fashioning relief by submitting proposed orders and additional information in supporting briefs. The court first urged the parties to 'make every effort' to reach an agreement on the order. *Id.* at 127. *See also MGPC, Inc.*, 725 F.2d at 1379 n. 3 (remanding a contract case to trial court and advising the court to "consider the wisdom of seeking an amicus brief" from the Department of Energy in the event that the court encounters difficulty in supplying a contractual pricing formula).

In this case, the testimony reveals that both parties expected to reconcile the charges in the context of the DRG system. It further indicates that the parties' were able to compromise and to arrive upon an agreement, and that they were aware of one another's goals. In the spirit of this compromise, the Court appoints Ronald E. Wiss, Esq. as Special Master to conduct mediation sessions with the parties. In light of the foregoing, it is quite probable that, with the assistance of the Special Master, the parties might negotiate an alternate pricing system that is both comparable to the rates under the former DRG regime and suitable to the parties' original goals.

Before it shall approve any judicial modification of the Agreement, therefore, the Court urges the parties to engage in good faith bargaining. In the event that these efforts fail and the parties are unable to reconcile their differences, the Court enlists the aid of Special Master Wiss to determine the "reasonable value" of the services the hospital rendered to U.S. Healthcare from 1992–93. Again, in this inquiry, the Special Master should bear in mind the parties' initial goals to establish a long-term, per diem/ maternity case rate system with an upward limit of discounts correlating to the governmentally-fixed DRG system. Specifically, the Special Master's task is to formulate a rating system comparable to this former system for the purpose of applying the discount clause.

As noted, the Record currently supplies the decision maker with insufficient means by which to craft a remedy. The Court therefore authorizes the Special Master to conduct proof hearings as he deems appropriate. Pursuant to Rule 53, he may require production of evidence, examine witnesses under oath, and "do all acts and take all measures necessary or proper" to perform his duties. Furthermore, pursuant to *Westec*, the Court authorizes the Special Master to require the parties to submit any supplemental briefs or information which he may require.

In the event that the parties come to an agreement through mediation, they shall submit their proposed Order to the Court. This proposed Order shall contain the agreed upon pricing term and the results of the parties' calculations. In the event that the parties fail to come to an agreement through mediation, the Special Master shall conduct hearings and collect evidence as he deems appropriate to formulate a viable pricing term. The Special Master shall subsequently submit to the Court a Report and Recommendation as to the appropriate billing mechanism that should be in place in the absence of the DRG system. The parties shall be equally responsible for compensating the Special Master for his services.

## E. Maternity Case Rate Billing.

 Having decided to enforce the discount clause, and having ordered the parties, or, alternatively, the Special Master, to formulate a rating system that is comparable to the former DRG system for the purpose of enforcing this clause, the issue remains whether the amounts billed for normal newborn babies are to be included in the 1992 and 1993 reconciliations required under the discount provision. The Court finds that they are, and reaches this determination by applying the principles of contract interpretation discussed above. *See* discussion of contract interpretation *supra* at pp. 20–24.

Firstly, the language of the Agreement unambiguously states that maternity care pertains to "services for both mother and child," and that U.S. Healthcare will pay a case rate for both vaginal and C–Section deliveries "includ[ing] normal newborn[s]." The Court finds, as a fact, that this language obligated the defendants to pay a case rate for normal newborns (in conjunction with their mothers), and that the charges for newborns must, therefore, be included in the reconciliations of the discount clause.

Secondly, this interpretation corresponds with the plaintiff's purpose for insisting on the discount clause, which was to receive reimbursements so that it might earn at least 60 percent of the revenue it would have ordinarily received, absent the Agreement. According to the testimony, Crespi recognized this purpose and understood that plaintiff "wanted some protection on [its] normal revenues." [27] Under either the DRG or Charge Master billing systems, plaintiff's "normal revenue" for maternity cases included both the amounts billed for the mother and the normal newborns. Accordingly, to protect plaintiff's normal revenue, the charges for normal newborns must necessarily be included in the reconciliation under the discount clause.

In light of both the clear language and purpose of the Agreement, the Court finds that the proper application of the discount clause in 1992 and 1993 includes the amounts for normal newborns. The Court therefore agrees with plaintiff's reconciliations for the year of 1992, which are based on the DRG rates. The Court finds that U.S. Healthcare owes Unihealth $33,088.32 for services provided during that year (not including prejudgment interest).

Because the Court shall apply the discount clause to charges after January 1, 1993 by substituting the former DRG billing rates with a comparable lodestar, however, the Court rejects plaintiff's 1993 reconciliations, which are based on the hospital's own Charge Master rates. The Court orders the parties, or, alternatively, the Special Master to reconcile the amount defendants owe for 1993 services under the discount clause, based on the billing formula that is yet to be assessed.

## F. Prejudgement Interest.[28]

 The plaintiff seeks an award of prejudgment interest on the amount of judgment it receives. In New Jersey, a court may award a successful plaintiff in a contract case prejudgment interest on the amount of damages. *See, e.g., Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 478, 541 A.2d 1063 (1988); *AGS Computers, Inc. v. Bear, Stearns & Company, Inc.,* 244 N.J.Super. 1, 4, 581 A.2d 508 (App.Div.1990). The matter of prejudgment interest in contract cases is left to the sound discretion of the trial court. *See AGS Computers, Inc.,* 244 N.J.Super. 1, 581 A.2d 508 (citing *Meier v. New Jersey Life Ins. Co.,* 101 N.J. 597, 622, 503 A.2d 862 (1986)). The purpose of awarding prejudgment interest is to compensate the claimant for the loss of income the money owed would have earned if payment had not been delayed.[29] *See id.* In accordance with this

---

27. The Court further notes, but need not rely upon, the fact that Crespi's initial reconciliations on behalf of defendants correspond to this interpretation of the Agreement.

28. The defendants do not oppose plaintiff's request for prejudgment interest in their trial brief.

29. As a general rule, New Jersey courts award compensation in prejudgment interest even where the claims are not capable of ascertainment by mere computation, or where controversy exists as to the amount due. *See Ellmex Construction Co. v. Republic Insurance Co.,* 202 N.J.Super. 195, 210–213, 494 A.2d 339 (App.Div.

purpose and equitable principles, the judge may consider the appropriate rate of interest to award and the date from which interest is to run. *See id.* (citing *Tobin v. Jersey Shore Bank,* 189 N.J.Super. 411, 460 A.2d 195 (App. Div.1983).

 The Court, in its discretion, awards Unihealth prejudgment interest to compensate it for the loss of income the money owed under the Agreement would have earned if payment had not been delayed. It further finds that the federal statute for post-judgment interest, 28 U.S.C. § 1961(a), is the most appropriate statute from which to calculate the rate of prejudgment interest. Under the terms of the Agreement, U.S. Healthcare was to pay the reimbursements due under the discount clause within 180 days of the end of the calendar year. Therefore, the prejudgment interest that defendants owe plaintiff runs as of July 1, 1993 for payment due for 1992 services, and as of July 1, 1994 for payment due for 1993 services.

28 U.S.C. § 1961(a) computes the rate of interest as the rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury bills settled immediately prior to the date of the judgment. *See* 28 U.S.C. § 1961(a). The Court awards plaintiff prejudgment interest on the amount due for 1992 services at the rate of 3.54%, because this was the rate of the average accepted auction price on July 1, 1993.[30] Because the defendants owe plaintiff $33.088.32 for 1992 services, the Court finds the total amount of prejudgment interest to be $6286.22.[31] The Special Master shall calculate the amount in prejudgment interest that defendants owe plaintiff for the year of

1993. The prejudgment rates shall run as of July 4, 1994 until the date the parties' proposed order or, alternatively, judgment, is entered.

## CONCLUSION

For the reasons discussed herein, the Court orders defendants to pay plaintiff $39,374.54 for hospital services rendered in 1992. Furthermore, the Court refers this matter to Special Master Wiss, who shall, through mediation sessions or, in the alternative, adversarial proceedings: (1) formulate a rating system that is comparable to the former DRG system; (2) apply this rating system to reconcile the amount defendants owe for 1993 services under the discount clause, including prejudgment interest.

## ORDER

This matter arises from the non-jury trial held on February 10 and February 11, 1998, involving the above-captioned parties. For the reasons set forth in the accompanying Opinion,

**IT IS** on this 10th day of July, 1998 hereby

**ORDERED** that judgment be entered in favor of plaintiff for $39,374.54, which constitutes payment for hospital services rendered by Meadowlands in 1992 and prejudgment interest; and it is further

**ORDERED** that Ronald E. Wiss, Esq. is appointed Special Master to assist the parties, through mediation, to arrive at a charging formula that is comparable to the DRG system for the purpose of modifying the discount clause in the parties' agreement and reconciling the payment due for 1993 services; and it is further

---

1985). This is so because, in situations involving both liquidated and unliquidated claims, "the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered." *Id.* at 213, 494 A.2d 339 (citations omitted).

**30.** Because the Court calculates prejudgment interest, as opposed to post-judgment interest, it awards plaintiff the interest rate equivalent to the rate in place at the time the 1992 payments were due, as opposed to the time the judgment was entered.

**31.** This amount represents the interest accrued through annual compounding of the interest generated by the $33,088.32 award. To determine prejudgment interest, the Court has calculated the interest accrued between the date the payment was due, July 1, 1993, until the month of the entry of judgment, July 1, 1998. The Court compounded the interest due at the end of each year during this time period, and adding interest *pro rata* for the period between July 1, 1993 and July 1, 1998. The $6286.22 figure represents the sum of the interest amounts so generated.

**ORDERED** that, should the parties be unable to agree upon a suitable charging mechanism through mediation, the Special Master conduct hearings, receive evidentiary submissions from the parties, and file a Report and Recommendation as to the appropriate standard for plaintiff's billings, and it is further

**ORDERED** that the Special Master set forth in the Report and Recommendation the amount owed for 1993 services pursuant to this billing standard, including prejudgment interest; and it is further

**ORDERED** that the parties be equally responsible for the fees of the Special Master, as determined by his normal billing rate, along with any costs and expenses.